**Craig DeLOSS and Barry DeLoss, Plaintiffs,**

v.

**DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT and Jerry L. Bauer, Defendants.**

**Civ. No. 86–314–B.**

United States District Court, S.D. Iowa, C.D.

Sept. 30, 1988.

Mark E. Schantz, Richard Malm, Elaine Brown, Des Moines, Iowa, for plaintiffs.

Christopher Hagen, U.S. Atty., John Beamer, Asst. U.S. Atty., Des Moines, Iowa, for defendants.

## MEMORANDUM OPINION, FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER FOR JUDGMENT

VIETOR, Chief Judge.

This is an action under the Administrative Procedure Act, 5 U.S.C. § 702, for judicial review of a 1985 determination of the Department of Housing and Urban Development (HUD) to finance construction of 36 units of rental housing for the elderly in Spencer, Iowa, and to provide rent subsidy assistance for the project.[1] This project, Sunset Retirement Home East (Sunset East), is to be constructed on a site immediately adjacent to two existing HUD-assisted projects, Sunset Retirement Home South (Sunset South) and Sunset Retirement Home North (Sunset North).

The financing approved by HUD for Sunset East is to be provided pursuant to section 202 of the Housing Act of 1959, 12 U.S.C. § 1701q (§ 202), and the rent assistance pursuant to section 8 of the United States Housing Act of 1937, 42 U.S.C. § 1437f (§ 8). Section 202 authorizes HUD to make loans on favorable terms to private non-profit organizations (known as "sponsors") to assist in constructing housing for elderly and handicapped persons. Section 8 authorizes payment of rent subsidies to owners of existing rental housing or to § 202 sponsors in order to enable low-income persons to occupy dwelling units they could not otherwise afford.

Trial was held in March of 1988. The parties simultaneously submitted proposed findings of fact and conclusions of law on April 18, 1988, and oral arguments were heard on May 6, 1988.

## STANDARD OF REVIEW

In a proceeding such as this, for judicial review of agency action under 5 U.S.C. § 702, the reviewing court "shall hold unlawful and set aside the agency action" if it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or if the action failed to meet statutory, procedural or constitutional requirements. 5 U.S.C. § 706(2)(A)–(D); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 413–14, 91 S.Ct. 814, 822–23, 28 L.Ed.2d 136 (1971). In determining whether the agency action was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," the court must consider

> whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.

*Id.* at 416, 91 S.Ct. at 823 (citations omitted.)

## FINDINGS OF FACT

### *The Parties and the DeLoss Apartments*

(1) The plaintiffs are residents of Spencer, Clay County, Iowa.

(2) The defendant Department of Housing and Urban Development (HUD) is an agency of the United States of America. Defendant Jerry L. Bauer is the manager of the HUD office in Des Moines, Iowa.

(3) Plaintiff Barry DeLoss owns and operates a construction business. He also owns three apartment buildings in Spencer containing a total of 120 apartment units, plus a remodeled house containing 3 apartment units. He owns one of the apartment buildings (a 12–plex) and the remodeled house jointly with his brother, plaintiff Craig DeLoss, through a 50–50 partnership. The apartments are hereinafter referred to collectively as the "DeLoss apartments."

(4) Plaintiff Craig DeLoss manages all of the DeLoss apartments, and he serves as resident manager for one of the apartment buildings. A sister of plaintiffs serves as resident manager of another of the apart-

---

1. In July of 1986, I dismissed this suit on the ground that plaintiffs lacked standing to bring it. That ruling was reversed. *DeLoss v. Dept. of Housing & Urban Development*, 822 F.2d 1460 (8th Cir.1987).

ment buildings. Plaintiffs' mother does the bookkeeping for the apartments.

(5) With the exception of the remodeled house, all of the DeLoss apartments were built by Barry's construction company. Dodecagon Plaza contains 41 units (28 two-bedrooms and 13 one-bedrooms) and was built in 1970. The 12–plex contains all one-bedrooms and was built in 1979 or 1980. Oak–Crete Plaza contains 67 units (40 two-bedrooms and 27 one-bedrooms) and was opened in phases as floors were completed in 1981 and 1982.

(6) The DeLoss apartments constitute decent, safe and sanitary housing, and most if not all of them are suitable for occupancy by elderly persons. At the time of trial there were 13 elderly tenants in the DeLoss apartments.

*Existing Assisted Housing*

(7) Sunset Retirement Home was organized as a non-profit organization on July 1, 1959. The first fifty-one units of the project, consisting mainly of efficiency apartments, were opened in October 1966 with § 202 program financing. That facility is known as Sunset South. In 1983, HUD provided it with ten § 8 certificates, but only five are currently in use. In 1979, planning for a second unit of fifty units was commenced. HUD approved this project under § 202 and § 8 and a second building known as Sunset North was opened in September 1981. This unit contains fifty one-bedroom units.

(8) Another sponsor constructed a 52 unit elderly project (Spencer Manor) in the 1970s less than three blocks from the Sunset site. This was a "§ 221(d)(4)" project (12 U.S.C. § 1715*l* (d)(4)) for which HUD provided mortgage insurance and 100% § 8 rent assistance.

*HUD Programs and Processing Steps*

(9) HUD acts pursuant to section 202 of the National Housing Act of 1959, as amended, 12 U.S.C. § 1701q(a)(1), which authorizes the Secretary of HUD to make loans to private non-profit organizations in order to assist them in constructing hous-

ing facilities for low income elderly and handicapped families.

(10) Section 8 was enacted in 1974 as part of the Housing and Community Development Act of 1974, codified at 42 U.S.C. § 1437f, as an amendment to the United States Housing Act of 1937. This housing assistance program provides rent subsidies to new, existing, moderate rehabilitation, and substantial rehabilitation rental housing.

(11) The rent subsidy program of section 8 may operate independently of a section 202 project or in conjunction with it. The Sunset East project is to be built with section 202 funds and the tenants will receive section 8 subsidies, which is commonly called a section 202/8 project.

(12) Section 202 direct loans to borrowers (not-for-profit corporations) are distributed pursuant to applications which are processed on an annual cycle.

(13) After receipt of its appropriation from Congress, HUD headquarters (Washington, D.C., office) allocates the funds between metropolitan and nonmetropolitan areas and by region of the country. A Notice of Funding Availability, published in the Federal Register, establishes a deadline (usually May 15) for filing applications.

(14) The processing of applications is delegated to HUD field offices (here Des Moines), pursuant to directions set forth in the Processing Handbook, 4571.1 Rev. 2. Within the Des Moines field office, processing of § 202 applications is the responsibility of the Housing Development Division. William Van Vleet is director of this division.

(15) The field office begins the process by placing a legal advertisement soliciting applications by the deadline. An application packet is made available to interested borrowers.

(16) Applications received by the deadline are subjected to "initial screening" by the Multifamily Housing Representative (MHR) to determine whether they are complete enough for formal processing. Surviving applications are subject to "preliminary evaluation" to determine whether

they meet nine threshold criteria for further processing.

(17) Detailed evaluation of the surviving applications occurs at the "technical processing" phase. Various disciplines within the Housing Development Division, including the Economic and Market Analysis Division (EMA or EMAD), Valuation Branch (appraisal) and Management Division, are directed by the Processing Handbook to review and to analyze the application against a variety of requirements.

(18) At the technical processing stage, EMAD is required to conduct a "market analysis review" to determine whether there is demand for the number of assisted housing units proposed and, if the borrower proposes less than 25% efficiencies, whether efficiency units are readily marketable in the community. (HUD, as a cost containment measure, requires that 25% of the units in a § 202 project be efficiencies.) EMAD also does a site and neighborhood review to determine whether the site meets the requirement of avoiding an undue concentration of assisted persons in low-income neighborhoods. EMAD is also delegated the task of making the independent determination of need for housing assistance in communities, like Spencer, lacking a Housing Assistance Plan (HAP), as required by 42 U.S.C. § 1439(c). EMAD is required to prepare a written market analysis memorandum setting forth its findings and making a specific recommendation of approval or disapproval.

(19) HUD regulations forbid approval of § 202 applications "in locations where there is an oversupply of nonseasonal dwelling units suitable for occupancy by the elderly or handicapped" and require that there "must be a sustainable demand for assisted occupancy for the number of dwelling units proposed."

(20) At the technical processing stage, the Valuation Branch is required to make a site and neighborhood inspection, conduct a "location analysis" and prepare a written findings memorandum containing determinations regarding site acceptability, "marketability," and compliance with applicable zoning ordinances or regulations.

(21) At the conclusion of the technical processing stage, representatives of the various disciplines convene to determine which applications are approvable and to rank the approvable applications. Applications which are not approvable are not ranked and may not be funded that fiscal year.

(22) Ranking consists of two separate steps. Applications are first categorized as A–1, A–2, B–1 or B–2 by EMAD. The A–B classification reflects whether the locality has been relatively underfunded (A) or overfunded (B). The 1–2 classification reflects whether rental vacancies in the community were, respectively, less than or greater than 7% according to the most recent census data.

(23) The second step in ranking consists of assigning numerical ratings in five categories: (1) the borrower's capacity to carry the project through to long-term operation (20 points); (2) the borrower's financial capacity (30 points); (3) location (site/neighborhood) (15 points); (4) modest design/cost (30 points); and (5) extent of displacement and feasibility of relocation (5 points). None of these numerical ratings relate to the issue of need for the project. The only portion of the ranking process which relates to that issue is the A–1/B–2 classification. The Processing Handbook directs that category A applications must be selected before category B applications unless there is at least a 5–point differential relating to financial capacity or modest design/cost criteria.

(24) After the rating and ranking session, the MHR prepares a memorandum of recommended and "back-up" selections that is forwarded to the appropriate HUD regional office. The regional office reviews the field office recommendations for administrative consistency and makes its own prioritized recommendations to headquarters, including a "back-up" list.

(25) Final funding decisions are made in HUD's Washington office. After a fund reservation is made for a successful application, a project goes through several additional processing stages: conditional com-

mitment, firm commitment, initial closing and final closing.

*Sunset East Application—Overview*

(26) Sunset applied in 1983 for § 202/8 funds to construct another 60–unit addition to its retirement complex (Sunset East). This application was rejected by the Des Moines HUD field office at the preliminary evaluation stage because it did not meet threshold eligibility criteria concerning borrower eligibility.

(27) In 1984 Sunset again applied for § 202/8 funds to construct 50 elderly units. The application was rejected due to lack of market for 50 units. (Also during the 1984 § 202 application cycle, HUD received a 50–unit application called Pilgrim Manor co-sponsored by the Spencer First Congregational Church and the Retirement Housing Foundation. It too was rejected for lack of a sufficient market.)

(28) On May 15, 1985, Sunset again applied for funding but reduced the request to 36 living units. This project was found approvable and funded from the Secretary's Discretionary Funds.

(29) Sunset East was one of eight § 202/8 projects found approvable in Iowa in 1985. Only six projects were actually funded because of a shortage of funds resulting in only 142 living units receiving funds. Only two of these projects were for the elderly with the remainder for non-elderly handicapped persons.

(30) The formal "Notification of Fund Reservation" for Sunset East was dated September 27, 1985. Procedurally the project could not begin construction until all details were worked out from a financial and planning viewpoint. This is accomplished through the processing and issuance of a HUD Conditional Commitment and Firm Commitment.

(31) HUD issued a Conditional Commitment on February 27, 1986, and on September 30, 1986, HUD issued the Firm Commitment. Final plans and specifications have been completed and the project was ready for construction pending the Sponsor/Borrowers compliance with all Firm Commitment requirements. No attempt to gain compliance with these requirements has yet been made because of zoning problems and possibly the pendency of this suit.

*Details of HUD's Processing of Sunset East and Background*

(32) HUD's role in existing assisted housing in Spencer has already been noted.

(33) In 1979 another sponsor sought § 202/8 assistance for a 50–unit elderly project in Spencer (Country Manor), which was to be constructed immediately north of Spencer Manor. EMAD disapproved the project because it was not then needed, and it recommended that any additional assisted units in Spencer be located in another section of the city to provide housing choice for the elderly.

(34) In rejecting Sunset's 1983 application, Bauer stated:

> Utilization of this site would result in a concentration of elderly families. Although this is below the 200 limit threshold allowed, it is high considering the size of the community and would have been considered in ranking with other applications.

Bauer had reference to a HUD policy expressed as follows in its Processing Handbook:

> Although a Borrower may be a party to one or more applications for up to 200 units in any Region, reservations for projects intended primarily for the elderly generally will not be approved for more than 200 units. This policy is intended to avoid undue concentration of housing for the elderly in any one part of the community and to expand the number of areas in which the elderly can choose to live in housing specially designed to meet their needs.

A HUD regulation which provides that the site for a new construction project that will receive § 8 assistance that *"must* promote greater choice of housing opportunities." 24 C.F.R. § 880.206(d) (emphasis added).

(35) In processing Sunset's 1984 application, James P. Laakso, EMAD economist for Iowa and Nebraska, found that need in Spencer would support only 20–25 units

and that the application was unapprovable because he could not "justify the development of more than 30 units." He also rated the Sunset East site "excellent," commenting that it was "near services" and that there were "other elderly located on site."

(36) The first step in Laakso's methodology is to identify from the latest available census data the number of income-eligible elderly (age 62+) in the situs community who were "inadequately housed" at the time of that census. "Inadequately housed" in census argot refers not only to physical inadequacies but more frequently to an economic criterion: paying more than 25% (1970 census) or 30% (1980 census) of adjusted income for housing. The census calculation of such inadequately housed persons is not a direct measure of market need because many such elderly persons may not perceive that they are inadequately housed, may be unable or unwilling to move, or, as is especially true for elderly persons in their 60s, may not choose to live in housing for the elderly. (The average age in § 202 projects approaches 80 years. Counting everyone over 62 would seriously overestimate the market need. Moreover, HUD is to examine sustainable demand over the 40–year life of its mortgage.) In any event, the statistical census data must be evaluated in relation to the size of the proposed project. (*Id.*) Laakso translates the census calculation of eligible persons into market need by discounting by specific numerical factors or ratios. In 1984 he used a divisor of 4 within the community where the proposed project was to be located and a divisor of 8 for the remaining areas of the county.

(37) In 1984 Laakso used 1970 census data, the latest then available to him. In accordance with his customary methodology, he first determined that in Spencer in 1970 there were an estimated 171 elderly households with incomes at or below 80% of the median who were inadequately housed. Since 1970, 102 units of subsidized elderly housing had been provided in Spencer (Spencer Manor and Sunset North), leaving an unmet potential need of 69 (171% − 102 = 69). Laakso then divid-

ed the unmet need in Spencer by a factor of 4 and concluded that the market need or effective demand from Spencer was "less than 20 units."

(38) Laakso was orally informed that Spencer Manor and Sunset North had waiting lists of 25 and 45, respectively. Although he never saw the lists, he discounted for probable duplication and estimated that the aggregate lists contained 58 households. Using a norm of 3 to 1 for waiting list to effective demand, he confirmed his statistical estimate of a market need for less than 20 units (58 ÷ 3 = 19). Laakso's practice of dividing by 3 is grounded in the experience that it usually takes 3 calls to obtain an actual tenant from a waiting list.

(39) Laakso then proceeded to consider the market in Clay County outside of Spencer. His files showed 131 elderly households there who could utilize rental assistance. Dividing 130 by 8, he concluded that rural Clay County might generate 16 additional tenants "with outreach." Apparently then believing he was required to get approval of the Kansas City regional economist for such "outreach," he recommended against seeking approval because "HUD has provided for almost 60 percent of the elderly need in Spencer."

(40) Laakso's Sunset market analysis for 1984 proceeded to discuss Sunset's "listing of some 130 names in support of its market assessment." After elimination of names from beyond the environs of Spencer, Laakso stated that "if each household were bona fide, EMA computes that at most they would represent an effective demand for about 30 units. Therefore it is our determination that a demand exists for up to 30 units." The increase from 20 to 30 was based on Sunset's representations concerning its waiting list.

(41) Laakso apparently was not advised by Sunset in 1984 that the list of 130 names was not a bona fide waiting list. That list was obtained by circulating a sheet at the Senior Center without reference to whether the signers were eligible by age or income. The list was even signed by Janice Orr, the

**1528**

director of the Senior Center, who was not eligible by either age or income. Van Vleet admitted it was misleading to call a list prepared in that manner a waiting list.

(42) The selection panel concurred with Laakso and Bauer advised Sunset that its application had been rejected because of insufficient market demand. He further advised them that the eligibility criteria for future years would be very-low-income elderly (hereinafter VLIE) (50% or less of adjusted median income) rather than lower-income elderly (80% or less of median) and stated that "the majority of the units in the current two projects are occupied by other than the very low income (i.e. market renters and those above 50% of the median)."

(43) Before Sunset submitted its 1985 application, it contacted Laakso, who advised that there were 149 income-eligible elderly renters in Clay County who had a housing deficiency or were paying too much rent and that "the ratio to be used to determine the appropriate number of units to apply for was one unit per every four renters." Sunset Administrator John Rahn confirmed that the number 36 came from HUD prior to preparation of the 1985 application.

(44) On May 24, 1985, Laakso completed a preliminary evaluation review checklist for the Sunset application in which he stated: "This office has determined that the Normal Occupancy Potential would be 30 units however the site is well located and the project is associated with an existing successful operation. Therefore we determined that the project is acceptable for 36 units." After disapproving Sunset's proposed waiver of the 25% efficiency requirement, Laakso noted: "Exhibit 6 indicates 130 people on waiting list. Exhibit 22 60 people (58 households)."

(45) Two days earlier, on May 22, 1985, Laakso had completed a preliminary evaluation review checklist for a proposed 75-unit project in Iowa City (Johnson County), Iowa. He found the application unacceptable for lack of market, estimating the project was 25% too large. He stated: "EMA data indicates 233 Very Low Income Elderly need or effective demand for 58 units." That conclusion rests upon dividing 233 by a factor of 4. Laakso focused only on Iowa City, not greater Johnson County.

(46) Exhibit 6 to Sunset's 1985 application contains the following representations to HUD:

The Sunset Retirement Home organization was formed in 1960 and in 10/1966 opened a 50-unit 3-story building. In 9/1981 the second 50-unit 3-story building was completed. All units are now fully occupied with a waiting list of 130 people and the inquiries of possible vacancies are numerous * * *. Please look at Exhibit 18 for excellent location of cleaning, restaurant, department store, bank, drug store and grocery store * * *.

(47) Laakso was on vacation from June 3–14, 1985. He returned to the task of completing market analyses for eight Iowa and an unknown number of Nebraska applications. His technical processing findings memorandum for Sunset was prepared June 21, 1985. He first placed the application in category "B," indicating that Spencer had been relatively "overfunded." He then rated the site "3" on a scale of 1–5, stating that it would tend to concentrate assisted elderly, but that the neighborhood was not concentrated with assisted persons and that there was good access to shopping. In his independent determination of need, he characterized the need in Spencer as "marginal," found the "local need estimated to be 89 very low income elderly renters" and dropped a footnote: "Sponsor reports a 'waiting list' of 130 people which is sufficient to support the 36 units applied for." Laakso testified that the number 89 represented a "straight line" estimate of the number of VLIE renters in Spencer, derived from the knowledge that the 1980 census showed 149 VLIE renters in the county and that 60% of the Clay County population resided in Spencer (149 × 60% = 89.4). Inasmuch as 89 divided by 4 yields only 22, it appears that on June 21 Laakso relied on the "waiting list" of 130 to justify his approval of 36 units.

(48) Laakso's supplemental technical processing memorandum was prepared June

24, 1985. He again found that the "market while statistically marginal is acceptable." However, his narrative market analysis differed from that in his June 21 memo.

(49) In his June 24 memo Laakso again began with the number 149, the number of Clay County inadequately housed VLIE renters according to the 1980 census. He subtracted 4 as the number assisted since 1980 to arrive at 145 as the unmet need in Clay County. He then divided by 4 to calculate an occupancy potential of 36.

(50) Although Laakso and Donald Gebauer, a HUD regional economist, testified that Clay County is the "market" for Sunset, Laakso's June 24 memo then proceeded to analyze separately Spencer and the balance of Clay County. Abandoning the straight line (60%) estimate used in 1984 and in his June 21 memo, Laakso estimated on June 24 that 75% of the Clay County VLIE renters resided in Spencer. This generated an estimate that the VLIE need in Spencer was 112. (Laakso forgot here to subtract the 4 assisted since 1980, which he had noted in the first paragraph of his June 24 memo. Had he done this subtraction, the number would have been 108 rather than 112.) Dividing 112 by 4, he concluded that 28 represented the effective demand in Spencer. He noted that "outreach" into Clay County would be required for initial occupancy and long term demand.

(51) Laakso's June 24 analysis again referenced that "the application indicates" a waiting list with 130 names on it. Laakso acknowledged he never saw this "waiting list;" moreover, he never visited with Sunset's resident manager about the waiting list or Sunset vacancies. After noting that *if* all 130 were VLIE renters residing in Spencer the "waiting list" would indicate demand for 43 units (dividing by 3), he observed that he had inadequate information to evaluate the "waiting list" and stated he "gave very little weight to the data."

(52) Laakso went on to state that the 100 existing Sunset units "are 100 percent occupied," that "there are no other assisted multifamily in the immediate area," and

that the "site is just blocks from shopping and other services desired by the elderly."

(53) Valuation Branch also did a technical processing findings memorandum for Sunset in 1985. Valuation down-rated the site because of the lack of a grocery store within reasonable walking distance and the expense of a taxi, and because of the overconcentration of elderly by having 136 units at one site in a community the size of Spencer. Valuation merely relied on EMAD's determination of a market for 36 units, adding no independent observations.

(54) The site inspection report elaborated upon Valuation's concerns about the Sunset location. After noting that Sunset is located near "a small 'mini-mall' with little to offer," that "much of the retail space has been vacated," that a grocery store that used to be in the mall had never reopened, and that the nearest grocery store was a mile away with no public transit available, Valuation offered this summary:

> Normally we would reject a site which does not have a grocery within walking distance, unless it is on a city bus route and has other amenities nearby. That is why I rejected this site location last year. However, I was overruled and it was believed another grocery would eventually take over the vacant store. It is becoming obvious now that this is not likely to happen. While the proposal still was not selected the Sponsor was encouraged to reapply without mention of the lack of a grocery. To reject the site now because the area is losing its retail business, but nothing dramatic has changed since last year would be unfair to the Sponsor and inconsistent on our part. Also there are other amenities near the site as mentioned above and the taxi is available.

Therefore, I recommend we accept the site location but give it the lowest possible ranking score (1) for proximity to amenities.

(55) HUD's field office selection panel determined the Sunset project was eligible for funding. Alone among the nonmetropolitan projects, however, the Sunset application was not recommended for funding

because there were insufficient funds available to cover all of the eligible applications and Sunset's ranked lower than the other nonmetropolitan applications.

(56) The Kansas City regional office also declined to include Sunset in its 1985 list of recommended selections for funding to HUD headquarters. Rather, after reducing Sunset's rating score from 72 to 65 (of a possible 100), the regional office merely identified Sunset on its "back-up" list. The project was eventually funded from "headquarters discretionary funds," not because it had any special merit overlooked at the field office or regional levels, but "because it was a nonmetropolitan proposal and there was a need to meet the minimum 20 percent nonmetropolitan requirement."

(57) Sunset was notified by HUD on September 27, 1985, that funds had been reserved for its 36–unit project.

### Errors and Omissions in the 1985 Determination of Need

(58) The decision to approve Sunset's 1985 application, i.e., the determination of need for the project, rested upon a series of factual propositions which have been shown by the evidence to be materially erroneous.

(59) In calculating the unmet need for Clay County as part of his statistical analysis, Laakso admittedly failed to subtract the 50 assisted units completed since the 1980 census. (Sunset North commenced occupancy in September 1981.)[2] In other words, the number of households assisted since 1980 should have been 54 rather than 4. Van Vleet was unaware of this error in 1985. Laakso also did not subtract the ten § 8 certificates provided to Sunset South in 1983. If the statistical analysis is performed as Laakso performed it in 1984 and in his first 1985 memo, but subtracting 50 for Sunset North, the resulting need is not 36 for Clay County, but only 17 ($149 \times .60 = 89 - 50 = 39 \div 4 = 10$ for Spencer) + ($149 \times .40 = 60 - 4 = 56 \div 8 = 7$ for Clay County outside Spencer). If the ten § 8

certificates were also subtracted, the resulting need figure would be 14.

(60) Laakso and Gebauer suggested that a reallocation of the proportion of Clay County VLIE residing in Spencer would offset this error, but analysis belies this suggestion. In his second 1985 memo, Laakso estimated the Spencer portion of the Clay County VLIE renters to be 75% rather than 60%. This modification, however, at most increases the resulting Clay County need to 20. ($149 \times .75 = 112 - 50 = 62 \div 4 = 15.5$ for Spencer) + ($149 \times .25 = 37 - 4 = 33 \div 8 = 4$ for Clay County outside Spencer). If the ten § 8 certificates were also subtracted, the resulting need would be 17.

(61) Even if the proportion of Clay County VLIE renters residing in Spencer is estimated at 95% as suggested by Gebauer after the commencement of litigation on the basis of data acquired in 1986, the resulting Clay County need would still be less than 24 ($95 \times .95 = 90 \div 4 = 22.5$ for Spencer) + ($95 - 90 = 5 \div 8 = .625$ for Clay County outside Spencer).

(62) It clearly appears that the corrected 1985 statistical analysis of need is both absolutely and relatively (in relation to the number of proposed units) less than it had been calculated in 1984. This is entirely to be expected, given the tightening of eligibility criteria between 1984 and 1985 and the use of 1980 rather than 1970 census data in 1985. In 1984, Laakso's data showed 200 Clay County inadequately housed *lower income* elderly. His 1985 data, adjusted as above by subtracting 54 rather than 4, shows only 95 inadequately housed *very low income* elderly in Clay County ($149 - 54 = 95$). If a pool of 200 potential occupants would not support a 50–unit project in 1984 (ratio of 4 to 1), it could not consistently be maintained that a pool of 95 potential occupants would support a 36–unit project in 1985 (ratio of only 2.6 to 1).

---

**2.** Laakso made this error even though Sunset's 1985 application stated in at least two places

that Sunset North opened in September 1981.

(63) Approval of Sunset's 1985 application was also statistically inconsistent with the rejection of the 1985 application from Iowa City. There, Laakso found that a potential occupant pool of 233 would not support a 75–unit project (ratio of 3.1 to 1).

(64) Laakso's other errors or misstatements in his memos of May 24 and June 25, 1985, also all resulted in an overstatement of the need for the project. His references to a "waiting list" with 130 names were inaccurate because the 1985 waiting list consisted of only 58 names. Furthermore, the 1985 list was not a current waiting list. Sunset resident manager Candace Norgaard–Kunath prepared the list by typing names from a card-file that had not been updated and had market rate tenants in it. It also included people who wanted to move from the South building to the North building. After the Sunset East application was funded, Kunath wrote to the people on the list asking them to respond if they wanted to remain on the list. Only about 25 persons responded.

(65) Laakso's statement that Sunset's 100 units were 100% occupied, apparently made in reliance on Sunset's application, was also materially in error. According to HUD records maintained in Laakso's files, on June 30, 1984 (the date of the most recent report available to Laakso at the time he prepared Ex. 31 and 126), Sunset North had 5 market rate tenants (10%). In June 1985, Sunset South, despite having ten § 8 certificates, had 4 vacancies.

(66) Laakso's statement that "the site is just blocks from shopping and other services desired by the elderly" appears to have overlooked the facts known to HUD and to Laakso that the nearby "mini-mall" was distressed in general and that the grocery store had closed. Moreover, Sunset's proximity to Spencer Manor makes Laakso's statement in his June 24 memo that "there are no other assisted multifamily in the immediate area" materially inaccurate.

(67) Laakso's 1985 Sunset market analysis, consisting only of a statistical analysis and a review of Sunset's misleading application, was considerably less comprehensive than was HUD's practice for other markets known to be statistically "marginal." It was also less comprehensive than required by HUD regulations (24 C.F.R. § 791.302).

(68) Spencer's population declined, according to HUD estimates, by 526 persons from 1980 to 1985. The Clay County population declined by an estimated 900 persons (4.6%) from 1980 to 1985, with a net outmigration of 1600 persons. If the average household size is 2.6 persons, then the outmigration represents a loss of approximately 620 households in Clay County, about half of which would be in Spencer.

(69) The primary explanation for the outmigration is apparent from the Iowa Department of Job Service's Labor Force Data, a copy of which was maintained in Laakso's files. From 1980 through 1985, the resident civilian labor force (the sum of employed and unemployed workers) in Clay County declined by 1,350 persons (13.2%).

(70) While the demand for housing was dropping sharply between 1980 and 1985, the supply of rental housing increased, including 50 new units at Sunset North and 67 new units at the DeLosses' Oak–Crete Plaza. These supply and demand factors combined to produce significant increased vacancies in privately owned rental units.

## CONCLUSIONS OF LAW

### Jurisdiction

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331.

### Plaintiffs' Standing

Plaintiffs are persons adversely affected or aggrieved by HUD's action and have standing to challenge HUD's action. 5 U.S.C. § 702; *DeLoss v. Dept. of Housing & Urban Development*, 822 F.2d 1460 (8th Cir.1987).

### Statutes and Regulations

The § 202 loan program was enacted as part of the Housing Act of 1959, and the § 8 rent subsidy program as part of the Housing Act of 1937. In 1974, Congress enacted the Housing and Community De-

velopment Act in an effort "to consolidate and simplify existing programs." S.Rep. No. 93–693, 93d Cong., 2d Sess., *reprinted in* 1974 *U.S.Code, Cong. & Ad.News* 4273. In the 1974 Act, Congress sought to coordinate existing programs, such as the § 202 and § 8 programs, with the broader goal of the 1974 Act's community development program, which was to make cities "more livable, attractive and viable places in which to live." *Id.* at 4274. The goals of the community development program were to be implemented by HUD-approved local housing assistance plans (HAPs), which were to be developed with substantial input from "affected citizens." 42 U.S. C. § 5304.

As a bridge between the community development program and the existing housing assistance programs, Congress enacted 42 U.S.C. § 1439 as part of the 1974 Act. Section 1439 prohibits HUD from approving an application for housing assistance, including § 202 and § 8 assistance, if the application is "inconsistent" with the community's HAP. 42 U.S.C. § 1439(a). For communities (such as Spencer) that do not have a HAP, § 1439 provides a substitute measure:

> For areas in which an approved housing assistance plan is not applicable, the Secretary *shall not approve* an application for housing assistance *unless* he determines that *there is a need for such assistance*, taking into consideration any applicable State housing plans, and that there is or will be available in the area public facilities and services adequate to serve the housing proposed to be assisted.

42 U.S.C. § 1439(c) (emphasis added).

A corresponding HUD regulation, codified at 24 C.F.R. § 791.302, delegates this determination to the HUD field offices and provides instruction on the data to be considered:

> With respect to each application for housing assistance to be provided in an area which does not have a HAP, the field office is required to make a determi-

nation as to *whether there is a need for such housing* and whether there is or will be available in the area public facilities and services adequate to serve the proposed housing.

\* \* \* In making [the] determination [of need], the field office *shall give consideration to* the contents of any applicable State or area-wide housing plan proposing housing assistance in the area, as well as *generally available data on population, poverty, housing overcrowding, housing vacancies, amount of substandard housing, or other objectively measurable conditions* pertaining to lower-income housing needs.

(Emphasis added).

Also relevant to this case is 12 U.S.C. § 1701t, which provides that in the administration of federal low-income housing programs, including the § 202 and § 8 programs, there shall be "the fullest practicable utilization of the resources and capabilities of private enterprise." *Accord,* 42 U.S.C. § 3532 ("the Secretary [of HUD] shall, among his responsibilities, \* \* \* encourage private enterprise to serve as large a part of the Nation's total housing and urban development needs as it can and develop the fullest cooperation with private enterprise in achieving the objective of the Department); 42 U.S.C. § 3531; 42 U.S.C. § 1441 (in attaining national housing objectives, "private enterprise shall be encouraged to serve as large a part of the total need as it can," and "governmental assistance shall be utilized where feasible to enable private enterprise to serve more of the total need").

Additional expressions of congressional intent relevant to this case are found in 12 U.S.C. § 1701q(a)(6)(A), which provides that in reviewing applications for § 202 loans, HUD may consider the extent to which such loans "will assist in stabilizing, conserving and revitalizing neighborhoods and communities." [3]

### *Standard of Review*

The standard of judicial review is set forth, *supra,* and need not be repeated.

---

**3.** *See Kirby v. HUD,* 675 F.2d 60, 68 (3d Cir. 1982), which states that § 1701q(a)(6)(A) does

not give HUD unbridled discretion despite its "may consider" language.

Additional principles of review under the standard are articulated below.

### Law Applied to Facts

The court concludes that the Des Moines HUD office's determination that Sunset's 1985 application was eligible for § 202/8 funding was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and failed to meet statutory and regulatory requirements. The bases for that conclusion are set forth below.

Agency action is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem, offered an explanation that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in viewpoint or the product of agency expertise." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 2866, 77 L.Ed.2d 443 (1983). The reviewing court must "look to see if the agency has examined relevant data and has articulated a rational explanation for its action." *Eagle–Picher Industries, Inc. v. E.P.A.*, 759 F.2d 905, 921 (D.C.Cir.1985). The court "must engage in a 'searching and careful' review of both the facts and the agency's reasoning to ensure that the agency's decision was a product of reasoned decisionmaking based on a consideration of the relevant factors." *Motor Vehicle Manufacturers Ass'n v. E.P.A.*, 768 F.2d 385, 389 n. 6 (D.C.Cir.1985), *cert. denied*, 474 U.S. 1082, 106 S.Ct. 852, 88 L.Ed.2d 892 (1986).

Applying the foregoing principles to the facts of this case, the court concludes that HUD's determination of need in connection with the 1985 Sunset application was arbitrary and capricious. First, HUD overlooked blocks of significant data bearing on the "need" issue, and thus "entirely failed to consider an important aspect of the problem." *Motor Vehicle Manufacturers Ass'n v. State Farm Mutual Automobile Ins. Co., supra*, 463 U.S. at 43, 103 S.Ct. at 2866. "When an administrative decision is made without consideration of relevant factors it must be set aside." *Shannon v.*

*HUD*, 436 F.2d 809, 819 (3d Cir.1970). *Accord, King v. Harris*, 464 F.Supp. 827, 836–41 (E.D.N.Y.1979), *aff'd mem.*, 614 F.2d 1288 (2d Cir.1979), *vacated and remanded*, 446 U.S. 905, 100 S.Ct. 1828, 64 L.Ed.2d 256, *aff'd mem. on remand*, 636 F.2d 1202 (2d Cir.1980) (HUD's determination that a proposed site would avoid undue concentration of assisted persons was arbitrary and capricious because HUD relied on outdated census data and failed to give appropriate consideration to other readily available relevant data, including the presence of other assisted housing nearby, vacancy rates in such housing, recent economic problems in the neighborhood and increases in the concentration of low-income persons.) Moreover, the determination of need rested on a series of materially erroneous factual propositions, most of which ran "counter to the evidence before the agency." *State Farm*, 463 U.S. at 43, 103 S.Ct. at 2866. Therefore, the need determination could *not* have been a "product of reasoned decisionmaking based upon a consideration of the relevant factors." *Motor Vehicle Manufacturers Ass'n v. E.P.A., supra*, 768 F.2d at 389 n. 6.

The conclusion that the 1985 determination was arbitrary and capricious does not rest on any disagreement with HUD on matters of judgment relating to housing markets. On the contrary, the conclusion rests entirely upon an application of accepted HUD methodology to accurate and undisputed facts. It is no intrusion upon the agency's special competence or the independence of the executive branch to permit review of and relief from the consequences of using materially inaccurate and incomplete data.

In concluding that HUD's determination of need was arbitrary and capricious, the court has given little or no weight to the agency's *post hoc* efforts to justify its decision. The court has taken this approach pursuant to the well-settled rule that agency action must be upheld, if at all, on the basis articulated by the agency itself at the time of its determination, and that *post hoc* explanations should not be considered. *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168–69, 83 S.Ct. 239,

245–46, 9 L.Ed.2d 207 (1962); *United States v. Garner*, 767 F.2d 104, 116–17 (5th Cir.1985). However, even if HUD's present efforts to justify its 1985 determination were considered, they would be rejected as insufficient. HUD presented only bald conclusions devoid of any factual support for the proposition that there was a need for 36 additional units of elderly housing in Spencer in 1985.

Consistency in decision-making is one of the basic requirements for non-arbitrary agency action. Thus, an agency must either conform itself to its prior norms and decisions or adequately explain the reasons for its departure. *Secretary of Agriculture v. United States*, 347 U.S. 645, 652–54, 74 S.Ct. 826, 830–32, 98 L.Ed. 1015 (1954); *Atchison, Topeka & Santa Fe Ry. v. Wichita Board of Trade*, 412 U.S. 800, 807–08, 93 S.Ct. 2367, 2374–75, 37 L.Ed.2d 350 (1973); *Mitchell Energy Corp. v. F.E. R.C.*, 580 F.2d 763, 765 (5th Cir.1978); *see also Mary Carter Paint Co. v. F.T.C.*, 333 F.2d 654, 660 (5th Cir.1964) (Brown, C.J., concurring), *rev'd on other grounds*, 382 U.S. 46, 86 S.Ct. 219, 15 L.Ed.2d 128 (1965) ("There may not be a rule for Monday and another for Tuesday, a rule for general application, but denied outright in a specific case."). As noted in the findings of fact, HUD's 1984 and 1985 determinations of need in connection with the Sunset applications are clearly inconsistent with one another. Moreover, as stated in the findings, the 1985 determination of need in Spencer cannot be reconciled with the contemporaneous but contrary determination made by HUD in Iowa City in 1985. Because HUD has failed to adequately explain its deviation from the norm in the case of its 1985 need determination for Spencer, that determination must be regarded as arbitrary.

The failure of an agency to comply with its own regulations and policies constitutes arbitrary and capricious conduct. Courts must overturn agency decisions which do not follow regulations promulgated by the agency itself. *Simmons v. Block*, 782 F.2d 1545, 1550 (11th Cir.1986); *see also Husky Oil Co. v. Department of Energy*, 582 F.2d 644, 651 (Temporary Emerg.Ct.App.1978); *Union of Concerned Scientists v. Atomic Energy Commission*, 499 F.2d 1069, 1082 (D.C.Cir.1974) ("an agency's failure to follow its own regulations is fatal to the deviant action").

As noted earlier, HUD's 1984 Processing Handbook for § 202 loans stated (Ex. 138: 4–40): "An application for a Section 202 fund reservation should not be approved in locations where there is an over-supply of nonseasonal dwelling units suitable for occupancy by the elderly or the handicapped." The evidence shows that in 1985 there was an over-supply of nonseasonal dwelling units in Spencer suitable for occupancy by the elderly. Therefore, HUD's approval of the Sunset application violated the foregoing provision of its own rules.

The Processing Handbook further states: "There must be a sustainable demand for *assisted* occupancy for the number of dwelling units proposed." (Emphasis added.) The combined presence of market rate tenants and actual vacancies at Sunset North and South, along with the similarly reduced levels of assisted occupancy at other government-subsidized projects in the Spencer area, indicates that there was *not* a sustainable demand for assisted occupancy for 36 additional subsidized units in Spencer in 1985. *See King*, 464 F.Supp. at 836 (vacancies in nearby subsidized housing projects indicated additional subsidized housing was not needed in the community.)

HUD violated 24 C.F.R. § 791.302 by overlooking significant data on population, housing vacancies and other objectively measurable conditions relevant to the 1985 determination of need for the Sunset East project, all of which the regulation expressly requires the field office to consider.

In sum, HUD's determination of need was arbitrary, capricious, an abuse of discretion and otherwise not in accordance with law, and failed to meet statutory and regulatory requirements.

It should perhaps be noted that some small measure of erroneous data and omission of relevant data probably creeps into most agency decisions in this imperfect world. A small measure of that would not normally invalidate the agency's action.

Here, however, the measure of erroneous data and omitted relevant data was large and highly significant, and pervades HUD's decision. Furthermore, use of erroneous data and overlooking of relevant data was the result of HUD's own making.

Because the foregoing is dispositive of the case, other grounds urged by plaintiffs are not decided. (Some of the findings made relate primarily to the matter of site rather than need; I have included those findings because I believe they add further dimension to the erroneous data foundation on which HUD acted.)

### Plaintiffs Entitled to Relief

The court concludes from the foregoing findings and conclusions that plaintiffs are entitled to the relief they seek.

### JUDGMENT

IT IS ORDERED, ADJUDGED and DE-CREED that the action of the Department of Housing and Urban Development in approving section 202/8 assistance for the Sunset Retirement Home East project, and all subsequent agency actions based thereon, are hereby declared unlawful and are set aside.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that defendants be and hereby are enjoined from disbursing any funds to Sunset Retirement Home East, Inc. pursuant to its 1985 application for section 202/8 assistance.

IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the costs of this action shall be taxed against defendants.