**TITAN WHEEL CORPORATION OF IOWA, Walcott, Iowa, Plaintiff,**

v.

**UNITED STATES ENVIRONMENTAL PROTECTION AGENCY, Defendant.**

No. 4:02–CV–40352.

United States District Court, S.D. Iowa, Central Division.

Nov. 10, 2003.

Brenton D. Soderstrum, Brown, Winick, Graves, Gross, Baskerville & Schoenebaum, PLC, Des Moines, IA, Stanley A. Reigel, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, MO, for Plaintiff.

Michele L. Walter, US Department of Justice, Washington, DC, for Defendant.

## ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT

GRITZNER, District Judge.

This matter comes before the Court on cross motions for summary judgment (Clerk's Nos. 12 and 17). Plaintiff Titan Wheel Corporation of Iowa ("Titan") appeals the final decision of the Environmental Appeals Board ("EAB") which upheld a $150,289 penalty imposed on Titan for violations of the Resource Conservation and Recovery Act, 42 U.S.C. § 6901 et seq. ("RCRA"). Defendant United States Environmental Protection Agency ("EPA") counterclaims for enforcement of the penalty plus interest and costs.

### JURISDICTION

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1337 which affords the district court "original jurisdiction of any civil action or proceeding arising under any Act of Congress regulating commerce or protecting trade and commerce against restraints and monopolies . . . ." 28 U.S.C. § 1337 (2000).

### STATUTORY SCHEME

■ The Resource Conservation and Recovery Act "RCRA" was enacted to provide a "comprehensive environmental statute that governs the treatment, storage, and disposal of solid and hazardous waste." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 483, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). RCRA's primary purpose is to "reduce the generation of hazardous waste

and to ensure the proper treatment, storage, and disposal of that waste which is nonetheless generated, 'so as to minimize the present and future threat to human health and the environment.'" *Id.* (quoting 42 U.S.C. § 6902(b)). RCRA's enforcement provision "empowers the EPA to regulate hazardous wastes from cradle to grave." *City of Chicago v. Envtl. Defense Fund,* 511 U.S. 328, 331, 114 S.Ct. 1588, 128 L.Ed.2d 302 (1994).

RCRA authorizes the EPA to promulgate requirements and standards applicable to owners and operators of facilities that generate, store, and dispose of hazardous waste. 42 U.S.C. §§ 6922, 6924, 6925 (2000). In addition, RCRA prohibits the treatment, storage, or disposal of hazardous waste without either a permit or "interim status."[1] *Id.* § 6925(a),(e).

A facility which generates in excess of 1000 kilograms of hazardous waste per month ("large quantity generator")[2] may accumulate hazardous waste on-site for up to ninety days without a permit or interim status. 40 C.F.R. § 262.34(a). However, a large quantity generator that exceeds the ninety-day limit must comply with RCRA's hazardous waste management regulations. *Id.* § 262.34(b). Those regulations require, inter alia, that the owners and operators provide training for the facility's personnel to ensure compliance. *See id.* § 265.16(a)(1), (b)-(e). The regulations also require the owners and operators to have a contingency plan for the facility "designed to minimize hazards to human health or the environment from fires, explosions, or any unplanned" release of hazardous waste. *Id.* § 265.51(a). RCRA authorizes the assessment of a civil penalty for violations. 42 U.S.C. § 6928.

Although RCRA is a comprehensive federal environmental statute, it does not preempt state regulation of solid waste. Rather, RCRA permits states to seek EPA approval to administer and enforce their own hazardous waste programs ("authorized states") in lieu of the federal program. *See* 42 U.S.C. § 6926(b) (2000) ("Any State which seeks to administer and enforce a hazardous waste program pursuant to this subchapter may develop and . . . submit to the Administrator an application . . . for authorization of such program. . . . Such State is authorized to carry out such program in lieu of the Federal program . . . ."). However, in states like Iowa which are not authorized to facilitate their own program, the EPA regulates hazardous waste under RCRA.

## FACTS

Since July of 1988, Titan has leased and operated a steel wheel manufacturing facility in Walcott, Iowa ("Facility"). The Facility generates solid hazardous waste as defined by 40 C.F.R. § 260.10.[3] In April 1996, Titan identified itself as a generator of hazardous waste by submitting a notification of hazardous waste activity to the EPA. Titan did not have an RCRA permit

---

1. "Interim status" is "a temporary condition intended by Congress to enable existing facilities to continue while their permanent permit application is pending. It is a stage prior to the EPA issuance or denial of a permit." *Hempstead County & Nevada County Project v. United States EPA,* 700 F.2d 459, 462 (8th Cir.1983).

2. The regulations do not apply to generators of less than 1000 kilograms of hazardous waste. 40 C.F.R. § 262.20(e).

3. The category of solid waste generated at the Facility is "spent" material which is "any material that has been used and as a result of contamination can no longer serve the purpose for which it was produced without processing." 40 C.F.R. § 261.1 (2002). Titan generated *spent solvents in its process of* flushing paint lines and cleaning equipment.

or interim status to operate as a treatment, storage, and disposal facility. At all pertinent times, Titan generated in excess of 1000 kilograms of hazardous waste per month and was subject to the requirements of a large quantity generator under RCRA. On February 10–11, 1998, the EPA conducted an RCRA compliance inspection at the Facility and found several violations.

On September 17, 1998, based on the violations discovered during the February inspection, the EPA filed a three-count Complaint and Compliance Order ("CCO") against Titan alleging (1) storage of containers of hazardous waste in excess of ninety days on eight different occasions;[4] (2) failure to develop or implement a personnel training program; and (3) failure to maintain a contingency plan. The EPA proposed a civil penalty of $153,209.[5] The CCO also ordered Titan to develop and implement a closure plan for hazardous waste container storage units and financial assurance statement ("closure plan"). Titan challenged the CCO through the administrative process.

On April 28, 1999, the parties filed pre-hearing briefs and exchanged witness and exhibit lists. During the pre-hearing exchange, Titan submitted exhibits showing the penalties assessed by the EPA and by state agencies in other hazardous waste violation cases.

On November 24, 1999, the EPA filed an amended complaint reducing the proposed penalties for each of the three counts for a total proposed penalty of $150,289. On the same day, the parties filed a Joint Statement of Facts ("Joint Statement") waiving their right to an administrative hearing and submitted the case on written briefs. In the Joint Statement, Titan conceded liability for the violations but challenged the proposed penalty as excessive.

On December 1, 1999, the EPA filed a motion to exclude certain pre-hearing exhibits submitted by Titan. The exhibits at issue were submitted to illustrate that the EPA assessed more severe penalties than those assessed by Missouri's authorized agency. The EPA argued the exhibits were irrelevant, immaterial, and of little or no probative value and were not admissible.[6] Titan resisted the motion, arguing RCRA's Penalty Policy required uniform application of penalties for similar violations and the exhibits illustrated the EPA's failure to adhere to that policy. Titan argued the exhibits also demonstrated that penalties assessed by the Missouri agency were substantially lower than pen-

---

4. RCRA categorizes solid waste as either a listed hazardous waste or as waste exhibiting hazardous characteristics including ignitability. 40 C.F.R. § 261 (2002). It is undisputed that the spent non-halogenated solvent stored at the Facility was classified as D001–exhibiting characteristics ignitability and as a listed hazardous waste F003 and F005. The storage periods in excess of ninety days were (1) May 13, 1994, to September 7, 1994 (118 days); (2) February 2, 1995, to June 16, 1995 (134 days); (3) June 16, 1995, to March 6, 1996 (264 days); (4) March 6, 1996, to August 18, 1996 (160 days); (5) August 18, 1996, to December 2, 1996 (111 days); (6) December 2, 1996, to April 24, 1997 (143 days); (7) April 24, 1997, to August 14, 1997 (112 days); and (8) October 11, 1997, to April 17, 1998 (187 days). During the last violation period, the waste was classified as D001 and F003; during all other periods, the waste was classified as D001, F003, and F005.

5. The amounts per count were as follows: Count I—$55,805; Count II—$76,389; and Count III—$21,015.

6. Part 40 C.F.R. § 22 contains the Consolidated Rules of Practice ("CROP") governing the administrative assessment of civil penalties; subpart D therein details the rules governing the hearing procedure. 40 C.F.R. § 22.21–.26. The rule governing admission of evidence states in pertinent part as follows: "The Presiding Officer shall admit all evidence which is not irrelevant, immaterial, unduly repetitious, unreliable, or of little probative value ...." 40 C.F.R. § 22.22(a).

alties the EPA proposed for similar violations.

On December 13, 2000, Administrative Law Judge William B. Moran ("ALJ") granted EPA's motion to strike. He reasoned that "even if it could be demonstrated that penalty determinations for similar violations varied widely between state and EPA enforcement actions, such disparities are not relevant. Only wide disparities for similar penalties imposed *by a particular enforcement agency* can, theoretically, be subject to the claim that a proposed penalty is arbitrary or an abuse of discretion." ALJ's Initial Decision (Pl.'s App. at 42). The ALJ went on to remark that even if Titan's propositions regarding uniformity of penalties were correct, it is equally plausible that in the name of uniformity, the states should be required to adjust their proposed penalties upward to be consistent with those sought by the EPA. *Id.* Furthermore, the ALJ found it was insufficient for Titan to simply make assertions regarding inconsistent penalties and point generally to hundreds of pages of documents for the Court to sort through in order to sustain Titan's assertions. *Id.* "To defeat a motion to exclude documents, a respondent must point to the particular documents, and the pages within those documents, and then show an identity of facts and circumstances in those cases with the core facts in the case in litigation to demonstrate such an abuse of discretion in the penalty being proposed." *Id.* at 42–43. The ALJ concluded, *"in this instance* the evidence [Titan] has presented of penalties sought in completely separate actions cannot be admitted as evidence to show a disparity between the proposed penalty in the instant matter and those in other matters, as such information does not have significant probative value and has no bearing on the determination of a penalty in the case at hand." *Id.* at 45.

The parties filed their post-hearing briefs on January 29, 2001. Therein, the EPA repeated its demand for penalties and a closure plan. When the parties submitted their post-hearing reply briefs on February 12, 2001, Titan submitted evidence allegedly showing that the EPA agreed to allow Titan to develop and submit a soil assessment work plan in lieu of a closure plan.[7]

On February 13, 2001, the EPA moved to strike the exhibits Titan submitted with its post-hearing reply brief, arguing Titan failed to submit the exhibits during the pre-hearing information exchange and had not shown good cause for failing to submit them at that time. Titan resisted the motion, arguing the exhibits demonstrate Titan's "good faith" efforts and were pertinent in calculating RCRA's gravity-based penalty assessment.

The ALJ's Initial Decision was rendered on May 4, 2001. Therein, the ALJ granted the EPA's motion to strike the post-hearing exhibits as untimely and irrelevant. The ALJ went on to adopt the EPA's proposed penalties and ordered Titan to pay $150,289 within thirty days. The ALJ further ordered Titan to comply with all actions listed in the CCO according to the timetable set forth therein.

On June 7, 2001, Titan appealed the ALJ's decision to the EAB arguing the ALJ erred (1) by striking the pre-hearing evidence regarding penalty assessments in other cases and by other agencies; (2) by striking the post-hearing exhibits regarding the closure plan; and (3) by misapplying the RCRA Penalty Policy and thus imposed excessive penalties which were

7. The two exhibits were the affidavit of Titan's attorney, Stanley Reigel, and a letter from the EPA dated October 12, 1999, stating the soil assessment plan Titan submitted did not meet the CCO's closure plan requirements. Pl.'s App. at 202–04.

arbitrary, capricious, and an abuse of discretion.

On June 6, 2002, in a detailed fifty-eight page opinion, the EAB issued the Final Decision affirming the ALJ on the evidentiary and civil penalty rulings. First, regarding the exclusion of pre-hearing exhibits offered as comparisons in disparate cases, the EAB held, "we agree with the ALJ that the evidence Titan seeks to admit is not relevant in the present context, and because Titan has failed to convince us that this determination was erroneous or an abuse of discretion, Titan's assertions are rejected." (EAB's Final Decision) Pl.'s App. at 142. Second, regarding the exclusion of post-hearing exhibits, the EAB held, "[b]ecause we find no error in the ALJ's decision, and Titan has not persuaded us that it had good cause for the late submission of exhibits, we see no reason to interfere with the ALJ's determination." *Id.* at 147. Finally, regarding Titan's challenge that the proposed penalties were excessive, the EAB found "no clear error or abuse of discretion in the penalty assessed by the ALJ for each of the three counts." *Id.* at 184. The EAB ordered Titan to pay the penalty within thirty days of its final decision and to comply with the other actions listed in the CCO. Having exhausted all administrative remedies, Titan filed the instant action seeking judicial review of the EAB's final decision.

## STANDARD OF REVIEW

The applicable standard of review of a final action by the EPA is found in the Administrative Procedures Act, 5 U.S.C. § 706, which states in pertinent part that the court must uphold the agency's decision unless it is "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2000). "The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.

Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). "This standard of review gives agency decisions 'a high degree of deference.'" *Sierra Club v. EPA,* 252 F.3d 943, 947 (8th Cir.2001)(quoting *Missouri Limestone Producers Ass'n v. Browner,* 165 F.3d 619, 621 (8th Cir.1999)(internal citations and quotations omitted in original)).

## DISCUSSION

On appeal, Titan argues the EAB erred in upholding the ALJ's decision to (1) exclude exhibits submitted during the pre-hearing exchange; (2) exclude exhibits submitted with the post-hearing brief; and (3) adopt the penalty assessment calculations.

## I. Exclusion of Pre-hearing Exchange Evidence

The ALJ granted the EPA's motion to exclude penalty assessment evidence Titan submitted during the pre-hearing exchange, reasoning it was irrelevant. ALJ's Order Granting EPA's Motion to Strike (Pl.'s App. at 42). The ALJ further opined that even if Titan had demonstrated the evidence was relevant, it had not pointed to specific documents; rather, Titan merely made the assertion and pointed generally to pages of documents, leaving the ALJ to sort through to determine if there was support for Titan's assertions. *Id.* The ALJ reasoned, "to defeat a motion to exclude such documents, a respondent must point to the particular documents, and the pages within those documents, and then show an identity of facts and circumstances in those cases with the core facts

in the case in litigation to demonstrate such an abuse of discretion in the penalty being proposed." *Id.* at 42–43.

The EAB upheld the ALJ's decision stating penalty assessments are fact and circumstance dependant and require a case-by-case calculation. (EAB's Final Decision) Pl.'s App. at 136. The EAB reasoned that simply comparing the penalties assessed in disparate cases, even when the same statutory provisions are involved, does not account for a variety of factors, including the size of the business, the company's ability to pay a penalty, or prior violations. *Id.* at 142.

■ Titan argues the EAB erred because the evidence was relevant and its exclusion was an abuse of discretion. Titan cites *Blinder, Robinson & Co. v. SEC,* 837 F.2d 1099, 1112 (D.C.Cir.1988), for the proposition that an ALJ's exclusion of relevant evidence is an abuse of discretion and grounds for remand. The wisdom of this rule is self-evident, but the application of the rule requires an assessment of the proffered evidence.

In *Blinder,* the Securities and Exchange Commission ("SEC") brought a civil enforcement action in district court against a broker-dealer, Blinder, Robinson & Co. ("Blinder"), and its president for violations of federal securities laws. *Id.* at 1100. During the pendency of that litigation, the SEC instituted an administrative proceeding against Blinder and its president. *Id.* Based on principles of issue and claim preclusion, the ALJ ruled that evidence relating to "any matters addressed in the district court's opinion" could not be introduced. *Id.* at 1101–02. Blinder challenged this ruling on appeal, arguing that one of the factors the SEC should have considered in crafting its sanction was whether the petitioner sought the advice of counsel concerning possible securities law violations. *Id.* at 1109. Since the ALJ excluded all evidence relating to the district court's opinion, including facts relating to petitioners' advice of counsel, the Court of Appeals for the District of Columbia held that the Commission erred by refusing "to permit evidence with respect to a salient factor" and remanded the case. *Id.* at 1112.

The evidence excluded in *Blinder* is distinguishable from the evidence excluded in the present case. In *Blinder,* the excluded evidence was from a parallel proceeding in the same matter with like issues.[8] *Id.*

8. In *Blinder,* the petitioner also challenged the SEC sanction arguing it dispensed harsher sanctions against smaller, newer firms than it did against old-line, more established firms. *Blinder,* 837 F.2d at 1112. The Commission defended its position arguing "that the crafting of an appropriate remedy is peculiarly within the province of an expert agency, and can appropriately be judicially disturbed only where the remedy is 'unwarranted in law or ... without justification in fact ....'" *Id.* at 1111 (quoting *Butz v. Glover Livestock Comm'n Co., Inc.,* 411 U.S. 182, 185–86, 93 S.Ct. 1455, 36 L.Ed.2d 142 (1973)). Without reaching that issue, the court stated, "our analysis ... is inevitably affected by the Commission's error, ... in refusing to consider evidence relating to the relationship with counsel on grounds of issue preclusion.... [W]e will remand this case to the Commission for further action consistent with this opinion." *Id.* at 1112. However, the court in dicta warned the Commission that "we would be less than candid if we did not flag for the Commission our concern that petitioners have mounted a non-frivolous claim that they have been singled out for disproportionately harsh treatment." *Id.* The court reasoned that these allegations amounted to more than mere disparities rather a "systemic pattern of disparate treatment." *Id.*

The thrust of the court's warning was that the Commission should not, without explanation, merely rely on its broad discretion in issuing sanctions. *Id.* The court suggested the Commission should instead explain "why what might appear to be troubling systemic variances are ... justified by the circumstances of this case." *Id.* The court concluded by stating, "[n]othing that we say suggests

Here, the excluded evidence was presented to show sanctions assessed in other cases or by other agencies as a comparison and was not a "salient factor" to the current case.[9]

## A. Was the evidence relevant?

 Titan argues the EAB's conclusion that penalty assessments are *never* relevant in determining whether a penalty is excessive was arbitrary and capricious. Titan recognizes that although a court will not generally set aside an agency's choice of sanction, if the sanction is clearly excessive as compared to other cases, the court will overturn the penalty.

The EAB did not assert that comparative penalty assessments are *never* relevant. To the contrary, the EAB held, "we agree with the ALJ that the documents relating to a comparison of penalties assessed by the EPA and the State of Missouri in other cases *are not relevant in the present context*, and we therefore affirm the ALJ's December 13, 2000 Order Granting Complainant's Motion to Strike." (EAB's Final Decision) Pl.'s App. at 135.

Titan argues comparisons are relevant because "excessive variance, something more striking than 'mere unevenness,' is evidence of arbitrary and capricious action" and grounds to set aside an EPA's

in the slightest that the Commission does not enjoy wide latitude in fashioning appropriate sanctions; such latitude is inherent in the Commission's broad grant of power from Congress, and is confirmed by such teachings as the Supreme Court's decision in *Butz*." *Id.* at 1113. Of note, then-Judge Ginsburg wrote a concurring opinion to express her misgivings about some of the reasoning in the majority opinion. *Id.* at 1114 (Ginsburg, J., concurring). "[M]y colleagues appear to have entrusted to the Commission a comparative analysis obligation heavier than any that has gone before." *Id.* (Ginsburg, J., concurring) (citing *Butz*, 411 U.S. at 187, 93 S.Ct. 1455).

In *Blinder*, the Court of Appeals instructed the Commission to explain its proposed sanctions beyond merely stating that Congress has given it broad discretion, but did not suggest that the Commission needed to perform a comparative analysis between disparate cases. *Id.* at 1113–14 ("Finally, we emphasize in this respect that the Commission's broad discretion in fashioning sanctions in the public interest cannot be strictly cabined according to some mechanical formula."). More importantly, unlike the present case, the evidence excluded in *Blinder* was not evidence of various sanctions proposed in disparate cases, rather the evidence was facts from the parallel proceeding pertinent to accessing sanctions. *See id.* at 1101–02 (discussing petitioners' fruitless effort to introduce evidence regarding petitioners' reliance on counsel).

**9.** Titan cites *NLRB v. Process and Pollution Control Co., ("PPC")*, 588 F.2d 786, 790–91 (10th Cir.1978), arguing the Tenth Circuit

found it was reversible error for the ALJ to reject relevant evidence. In *PPC*, a prospective employee brought action against defendant PPC alleging she was not hired because of her prior involvement in union activity and the employer had given a pretextual reason for not hiring her. *Id.* at 788–89. To rebut the charge of union-based animus, PPC offered evidence showing it hired other applicants with union involvement. *Id.* at 789. The ALJ excluded the evidence. *Id.* at 790. The reviewing court found evidence of the employer's prior hiring conduct should not have been excluded. *Id.* at 790. The court concluded that the "admission of the evidence in question might affect the overall assessment of the case, in view of the importance of credibility of the company's disavowals of anti-union animus. Accordingly we conclude that we should deny enforcement and remand." *Id.* at 791. The employer in *PPC* was accused of union-based animus; clearly, evidence offered to disprove this allegation was relevant. *Id.* at 789. In the present case, the evidence offered would not exculpate Titan, on the contrary, Titan admitted liability.

Titan also cites *Southern Utah Wilderness Alliance v. Norton*, 237 F.Supp.2d 48, 54 (D.D.C.2002), in which the ALJ's exclusion of evidence was grounds for remand. However, *Norton* was an environmental group's challenge to the EPA's approval of a gas and oil project and not an enforcement action. *Id.* at 52.

choice of sanctions. *Cross v. United States,* 512 F.2d 1212, 1218 n. 8 (4th Cir. 1975). At issue in *Cross* was the standard the district court should apply when reviewing a sanction under the Food Stamp Act, 7 U.S.C. § 2022(c), *amended by* 7 U.S.C. § 2023 (1977). *Id.* The statute in *Cross* granted the district court a de novo standard of review to "determine the validity of the questioned administrative action in issue." *Id.* at 1218–19. The district court had a statutory grant of authority to review the agency's action under a different standard of review than this Court has under RCRA. Furthermore, even under a de novo standard of review, the *Cross* court reasoned "the views of the Secretary as to the appropriate sanction in a given case of violation are entitled to very great, if not conclusive, weight." *Id.* at 1218.

Titan also cites *Monieson v. Commodity Futures Trading Commission,* 996 F.2d 852, 863 (7th Cir.1993), arguing past penalties are probative and should be admitted for purposes of determining the legitimacy of a penalty. In *Monieson,* the Commodity Futures Trade Commission ("CFTC") issued a complaint against a broker for violations of the Commodities Exchange Act ("CEA"). *Id.* at 854. The ALJ found the defendant guilty of the charges. *Id.* Reasoning the defendant was a "controlling person" within the meaning of the CEA, the ALJ imposed sanctions including a lifetime ban from trading, a $500,000 fine, and revocation of his broker's registration. *Id.* Upon review, the CFTC affirmed the ALJ's ruling but reduced the lifetime trading ban to a two-year ban. *Id.* The CFTC reasoned that "[i]f an administrative agency chooses a sanction that falls within statutory limits, review is highly deferential. . . . The exception to this rule is that sanctions may be modified or reversed where 'the remedy selected has no reasonable relation to the practice found to

exist.' " *Id.* at 862 (quoting *G.H. Miller & Co. v. United States,* 260 F.2d 286, 296 (7th Cir.1958) (quoting *Daniels v. United States,* 242 F.2d 39, 42 (7th Cir.1957))). The CFTC reasoned that although bans are within the statutory penalty scheme, "lifetime bans were rarely appropriate." *Id.*

Different than the present case, *Monieson* dealt with the application of statutory penalties *within* an agency, not a comparison *between different* enforcement entities. *Id.* Furthermore, *Monieson* modified the ALJ's sanction reasoning such a severe penalty was "rarely appropriate." *Id.* at 862. The sanctions in the present case are within the statutory penalty scheme, in fact, for each count the penalty is at the low end of the range. *See* (RCRA Penalty Policy) Pl.'s App. at 99, 104.[10]

Titan also cites *Essery v. Department of Transportation, NTSB,* 857 F.2d 1286, 1293 (9th Cir.1988), and suggests an agency's order should be reversed if it is inconsistent with penalties for similar violations. At issue in *Essery* was the revocation of a commercial pilot's certificate. *Id.* at 1287. The National Transportation and Safety Board ("NTSB") charged the helicopter pilot with violating the Federal Aviation Administration ("FAA") "low altitude" regulations and recommended revocation of his pilot's certificate. *Id.* The ALJ agreed the pilot violated regulations but found revocation was too severe when compared to other cases and imposed a 120–day suspension. *Id.* Upon review, the NTSB reinstated the revocation reasoning it was appropriate because the violation involved two incidents of low flight violations. *Id.* On appeal, the NTSB argued its final decision should be upheld because *Butz v. Glover Livestock Commission Co., Inc.* stands for the proposition that "a sanction within the authority of an agency is not

10. The details of the penalty assessments are discussed *infra* Part III.

rendered invalid in a particular case because it is more severe than sanctions [sic] imposed in other cases." *Id.* at 1291 (citing *Butz*, 411 U.S. at 187, 93 S.Ct. 1455). In reversing the revocation order, the Ninth Circuit reasoned that *Butz* was not dispositive because "the FAA, unlike the Secretary of Agriculture [as in *Butz* ], operates under a specific policy mandating uniformity of sanctions." *Id.* at 1291. The FAA enforcement manual states, in pertinent part, "[s]imilar violations under similar circumstances should result in the same type of enforcement action and sanction . . . ." *Id.* (quoting Dep't. of Trans., FAA Order No. 2150, ¶ 203c.3).

Titan argues that similar to the FAA, one of RCRA's goals is "to ensure that RCRA civil penalties are assessed in a fair and consistent manner." (RCRA Penalty Policy) Pl.'s App. at 85. This argument is not persuasive. First, this language cannot be read in isolation to imply the EPA is *mandated* to consider penalties assessed in other cases. Second, other language in RCRA's Penalty Policy suggests the opposite is true; that is, the penalty assessment in each case will vary according to the circumstances surrounding the violation. *See id.* at 82 ("EPA will use the narrative penalty assessment criteria set forth in the policy to argue for as high a penalty as the *facts of the case justify* should the case go to trial. . . . Regions also rata discretion to impose multi-day penalties . . . when *appropriate under the circumstances*") (emphasis added); *id.* at 83 ("[T]he gravity-based penalty . . . may be adjusted upward or downward *to reflect particular circumstances surrounding the violation*") (emphasis added). Most damaging to Titan's argument is the Penalty Policy's disclaimer:

> This policy is in no way intended to limit the penalty amounts *sought* in civil judicial actions. In civil judicial actions brought pursuant to RCRA the United States will at its discretion continue to file complaints requesting up to the statutory maximum civil penalty amount and to litigate for the maximum amount *justifiable on the facts of the case.*

*Id.* at 84 (second emphasis added). Unlike the policy language at issue in *Essery*, neither the language in the RCRA Penalty Policy cited by Titan nor the overall goals of RCRA mandate such uniformity between cases.[11]

---

**11.** Titan also cites *Braunstein v. United States*, 1987 WL 25249 (E.D.Pa.), *aff'd*, 857 F.2d 1463 (3d Cir.1988), arguing a penalty is appropriately determined to be arbitrary and capricious by comparing the penalty assessed in a prior similar case.

In *Braunstein*, USDA Food and Nutrition Service ("FNS") assessed a penalty which included a six-month disqualification from the Food Stamp Program. *Id.* at *2. However, to assess such a penalty, the FNS was *required* to consider evidence that, inter alia, "the clerk's violations must have been 'due to carelessness or poor supervision by the firm's ownership or management.' " *Id.* at *2 (quoting 7 C.F.R. § 278.6(e)(5)). The district court found that the ALJ did not consider evidence in the record which demonstrated the firm's lack of intent to violate the statute. *Id.* at *3. The court discussed a prior case and found that the agency had similarly not considered

all the evidence in the record in making its determination. *Id.* at *4–5.

In *Braunstein* and *Plaid Pantry, Inc. v. United States*, the courts were required "to examine the sanction imposed in light of the administrative record to judge whether the agency properly applied the regulations; to determine whether the sanction is 'unwarranted in law . . . or without justification in fact.' " *Plaid Pantry, Inc. v. United States*, 799 F.2d 560, 563 (9th Cir.1986); *Braunstein*, 1987 WL 25249, at * 1 (" '[A] sanction is arbitrary and capricious if it is unwarranted in law or without justification in fact.' ") (quoting *Cross*, 512 F.2d at 1218). In *Braunstein* and *Plaid Pantry*, the courts determined there was not sufficient evidence that the firms violated a required element of the regulation and therefore the agency's determinations were arbitrary and capricious under the circumstances of each case. *Plaid Pantry*,

The final case Titan relies upon, *Harmon Industries, Inc. v. Browner*, 191 F.3d 894 (8th Cir.1999), is equally unavailing. The issue before the Eighth Circuit in *Harmon* was whether the EPA could bring an action against a manufacturer when an authorized state had already worked out a compliance plan with the manufacturer for the same violations. *Id.* at 897. The district court found that the EPA's action seeking civil penalties violated RCRA and "contravened principles of res judicata." *Id.* In affirming the district court's decision, the Eighth Circuit discussed at length the legislative history of RCRA and the plain "in lieu of" language which allows states to implement their own hazardous waste programs. *See id.* at 899–902.

In *Harmon*, the EPA argued RCRA allowed either the EPA or the state to implement a state's hazardous waste program. *Id.* The Eighth Circuit rejected that argument reasoning that although the EPA had the power to "repeal a state's authorization if the state's program 'does not provide adequate enforcement of compliance with the requirements of' the RCRA", the language of the statute indicates "Congress intended to grant states the primary role of enforcing their own hazardous waste program." *Id.* at 899.

A state seeking authorization to substitute its own hazardous waste statute in lieu of RCRA must meet the federal minimum requirements, *id.* at 901, and as *Harmon* clarifies, the EPA cannot usurp an authorized state's enforcement power, *id.* at 902. Titan argues this means the EPA and state enforcement programs should be equivalent, and had the ALJ and the EAB properly applied the principles set forth in *Harmon*, they would have found it was clearly appropriate to compare EPA penalty assessments with state delegee penalty assessments. *Harmon* does not support Titan's argument.

The *Harmon* court never discussed the disparity between the EPA's proposed penalty of $2,343,706 and the modest "clean up" plan the Missouri Department of Natural Resources ("MDNR") accepted. *Id.* at 897. On the contrary, the court pointed out that after first affording the state agency the opportunity to correct its deficiency, "the EPA can initiate an enforcement action if it deems the state's enforcement action inadequate." *Id.* at 901. The court further reasoned that in the event the state does not initiate an enforcement action, the EPA may initiate one. *Id.*

■ *Harmon* acknowledges the EPA's practice of applying more severe penalties

---

799 F.2d at 565 ("There was not sufficient evidence to find it was plaintiff's practice to violate the regulations."); *Braunstein*, 1987 WL 25249, at *4 ("I further determine, as a matter of law, that FNS arbitrarily and capriciously disregarded binding regulations, 7 C.F.R. §§ 278.6(d) & (e)(5), in the course of evaluating the sanction to be imposed."). Contrary to Titan's assertion, *Braunstein* does not stand for the premise that sanctions are determined to be arbitrary and capricious by comparing sanctions in similar cases.

Titan also cites *Ward v. Derwinski*, 837 F.Supp. 517, 523 (W.D.N.Y.1992), asserting dissimilar penalties imposed for similar violations may be rendered unjustifiable in fact

where there are "regulations and guidelines requiring uniformity or constraining the agency's imposition of penalties." In *Ward*, the court found the agency *did* have such a policy and therefore was required to compare like penalties for like offenses. *Id.* ("The [Veteran's Administration] manual states, '[w]here a disciplinary action or adverse action is required ... the employee will not be penalized out of proportion to the character of his offense. In taking [action covered in this chapter], like penalties should be imposed for like offenses.' ") (quoting VA Manual, Ch. 7522(2)(a), (b) (citations omitted)). As stated above, the RCRA Penalty Policy does not have mandatory uniformity language.

when enforcing RCRA. *See id.* ("The EPA *may not, however simply fill the perceived gaps* it sees in a state's enforcement action by initiating a second enforcement action *without* allowing the state an opportunity to correct the deficiency and then withdrawing the state's authorization.") (emphasis added). *Harmon* is incongruous with Titan's assertion that state agencies' penalties must be *equivalent* to those assessed by the EPA; if this were so, the Eighth Circuit would not have detailed the EPA's options when it deems a state's enforcement action inadequate.[12]

Titan argues a policy which allows the EPA to dole out higher penalties in Iowa than the state agency assesses in Missouri makes no sense, and therefore this Court should find in Titan's favor. However, the Court is reviewing whether the agency based its decision on the established policy and may not substitute its own judgment for that of the agency.[13] *State Farm,* 463 U.S. at 43, 103 S.Ct. 2856. Furthermore, the Eighth Circuit recognizes that the EPA may impose stiffer penalties than the penalties assessed by an authorized state. *See Harmon,* 191 F.3d at 901 (reasoning "the EPA can initiate an enforcement action if it deems the state's enforcement action inadequate" once it has afforded the state the opportunity to correct the deficiency).

## B. Did the EAB and the ALJ apply the wrong evidentiary standard?

Titan argues the EAB affirmed the exclusion of the pre-hearing exhibits based solely on the ALJ's opinion rather than its own review of the exhibits and that such a blatant failure to consider all the relevant data is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with the law. Titan does not argue that the ALJ did not give an accurate representation of the evidence nor does Titan deny that all excluded evidence was submitted for the purpose of showing lack of uniformity.

The ALJ summarized the evidence Titan offered as:

(1) summaries of other enforcement actions; (2) documents received from the State of Missouri which pertain to enforcement actions filed and/or settled by that State under the Missouri Hazardous Waste Management Law during the previous two years. These documents include complaints, settlement agreements, legal motions and memoranda, inspection reports, photocopies of checks in payment of penalties, and accompanying transmittal letters; (3) letters from Respondent requesting summaries of enforcement actions, and EPA's responses thereto; (4) a list of enforcement actions taken by EPA, as printed from EPA's web site; and (5) documents received from EPA Region VII under a

---

12. Titan argues that if the EPA's penalties for comparable RCRA violations are consistently higher than those of an authorized state, either EPA's penalties are excessive or the state delegee is not fulfilling its obligation to meet the federal minimum requirements of RCRA. However, as stated above, the *Harmon* court anticipates differences by recognizing that if there is a disparity between the penalty assessed by the EPA and the one assessed by the state enforcement agency, the EPA can take further action if it chooses when a state's penalty assessment is not adequate. *Harmon,* 191 F.3d at 901.

13. In *Butz,* the Supreme Court overturned the Eighth Circuit Court of Appeals for substituting its own view for that of the Secretary of Agriculture stating, "insofar as the Court of Appeals rested its action on its view ... the court clearly exceeded its function of judicial review.... The fashioning of an appropriate and reasonable remedy is for the Secretary, not the court." *Butz,* 411 U.S. at 188–89, 93 S.Ct. 1455, *rev'g Glover Livestock Comm'n Co. v. Hardin,* 454 F.2d 109 (8th Cir.1972).

Freedom of Information Act request which pertain to enforcement actions filed and/or settled by EPA under the Resource Conservation and Recovery Act during the previous two years, including complaints and settlement agreements.

(ALJ's Order Granting Motion to Strike) Pl.'s App. at 35. Similarly, the EAB reviewed the exhibits and opined, "[e]ven if the exhibits were admitted into evidence, we agree with the ALJ that they fail to establish the existence of any significant inconsistencies in penalty assessments by either EPA or the State of Missouri in comparable cases or for comparable violations." (EAB's Final Decision) Pl.'s App. at 138.

The EAB was not conducting a de novo review, rather, the EAB reviewed the ALJ evidentiary rulings for an abuse of discretion. *In re J.V. Peters & Co.*, 1997 WL 221388, 7 E.A.D. 77, 99 (EAB 1997), *aff'd sub nom. Shillman v. United States*, No. I:97–CV–1355 (N.D.Ohio Jan. 14, 1999), *aff'd in part*, 221 F.3d 1336 (6th Cir.2000) (unpublished), cert. denied, 531 U.S. 1071, 121 S.Ct. 760, 148 L.Ed.2d 662 (2001). In applying this standard, the EAB reviewed the ALJ's findings, afforded them due deference, expounded upon them, and ultimately agreed with them. Therefore, the EAB met the applicable standard of review.

Next, Titan cites *In re J.S. Chem Corp.*, No. CWA–02–2000–3407, 2001 WL 1319057, 2001 EPA ALJ LEXIS 183, at *5 (Oct. 12, 2001), and argues the ALJ and the EAB incorrectly placed a burden on Titan to show the probative value of the evidence at the pre-hearing or "discovery" stage. In *J.S. CHEM CORP.*, the respondent's liability for violations of the Clean Water Act ("CWA") had already been established, and the only issue before the ALJ was the amount of the penalty. *Id.* at *1, 2001 WL 1319057. The respondent

sought to admit testimonial evidence regarding the respondent's compliance activities and the manufacturing operations at the plant. *Id.* at *2–3, 2001 WL 1319057. Such evidence was relevant and necessary for the ALJ to consider in calculating the penalty because the CWA requires that an ALJ *"shall* take into account the nature, circumstances, extent and gravity of the violation, or violations, and, with respect to the violator, ability to pay, any prior history of such violations, the degree of culpability, economic benefit or savings ...." *Id.* at *5, 2001 WL 1319057 (quoting 33 U.S.C. § 1319(g)(3) (2000) (emphasis added)).

Similar to *J.S. CHEM CORP.*, in the present case, Titan conceded liability which left only the penalty to be determined. Unlike *J.S. CHEM CORP.*, however, the evidence Titan sought to admit was not mandatory for the ALJ to consider in assessing a penalty. Titan's purpose in submitting the exhibits was to compare penalties between cases in Missouri and Iowa, as well as other penalties assessed by the EPA. As stated above, RCRA Penalty Policy does not require such a comparison. Therefore, the ALJ correctly concluded such evidence was not probative in assessing penalties under RCRA.

Titan argues the ALJ ruled on the issue prematurely, incorrectly placing a burden on Titan to demonstrate the probative value of the exhibits during the pre-hearing exchange. Titan further argues the ALJ's authority to exclude evidence is found only in 40 C.F.R § 22, Subpart D (Hearing Procedures), and not in Subparts A (General Provisions) or C (Pre-hearing Procedures), which "strongly suggests" the ALJ can only exclude exhibits that are offered into evidence during a hearing. This argument fails because the grant of authority *does* appear in Subpart A, which lists the powers of the ALJ stating "[t]he Presiding Officer [ALJ] may ... admit or exclude

evidence ... and do all other acts and take all measure for the maintenance of order and for the efficient, fair and impartial adjudication of issues arising in proceedings governed by these Consolidated Rules of Procedure." 40 C.F.R, § 22.4(c)(6).[14]

## C. Did the exclusion of this evidence violate Titan's right to due process?

■ Titan asserts its right to due process was violated because the ALJ excluded the relevant evidence regarding comparative penalty assessments. In support of this assertion, Titan cites a number of cases which demonstrate that the exclusion of *relevant* evidence violated the complainant's due process rights. However, before a due process violation can be considered, the evidence at issue must be deemed relevant. Because the EAB correctly affirmed the ALJ's conclusion that the evidence of comparative penalty assessments was not relevant, Titan's right to due process was not violated.

## II. Exclusion of the Post–Hearing Exhibits

■ On January 29, 2001, the EPA and Titan submitted post-hearing briefs, and on February 12, 2001, the parties submitted post-hearing reply briefs. With its

post-hearing reply brief, Titan submitted documents allegedly showing the EPA agreed to a soil assessment plan in lieu of the closure plan demanded in the CCO. The EPA moved to strike the exhibits as untimely and irrelevant. In the Initial Opinion, the ALJ granted the EPA's motion stating the exhibits were untimely and further reasoned they were irrelevant. (ALJ's Initial Decision) Pl.'s App. at 60–61. The EAB upheld the ALJ's decision that the exhibits were untimely and did not reach the relevance issue. (EAB's Final Decision) Pl.'s App. at 147. Titan asserts it had good cause for the delay; therefore, the ALJ's decision to exclude the exhibits was arbitrary and capricious.

Titan maintains that on October 26, 1999, the EPA agreed to allow Titan to submit a soil assessment plan in lieu of the closure plan ordered in the CCO. Titan asserts that it was not aware of the need to disclose this agreement until the EPA "reasserted" its demand for a closure plan in its post-hearing brief.

The EPA refutes this argument, stating the requirement for a closure plan was in the CCO and not a surprise to Titan. The EPA admits there was a meeting on October 26, 1999, but denies there was an agreement to drop the closure plan requirement.[15] The alleged agreement took

---

**14.** Titan also cites *In re Dr. Robert Schattner*, No. FIFRA–92–H–02, 1993 EPA ALJ LEXIS 460, at *2 (February 11, 1993), arguing there is no obligation to prove the probative value of the documents submitted in a pre-hearing exchange. However, in *Schattner*, the motion before the ALJ was not a motion to exclude evidence, rather the complainant moved to allow additional discovery. *Id.* at *1 n. 1. The ALJ reasoned that such motions were routinely granted. *Id.* The ALJ clarified that "[b]eing in the nature of discovery, pre-hearing exchange exhibits are, of course, not in evidence unless offered and admitted at the hearing." *Id.* at *2 n. 1. Furthermore, the ALJ clarified that although the evidence was being allowed for the pre-hearing exchange, objections to admission of those exhibits were matters to be

discussed and resolved at a *pre*-hearing conference. *Id.*

The motion to permit additional discovery in *Schattner* and the motion to exclude in the present case are distinguishable. Here, the parties waived the right to a hearing and relied on their written briefs. As such, the relevance and probative value of those submissions was properly considered in a motion to exclude. In *Schattner*, the granting of the motion to allow additional discovery was not an admission of evidence; therefore, a relevancy challenge was not proper at that time. *Id.*

**15.** In its Motion to Strike, the EPA explained that in addition to being untimely, the exhibits

place before the Joint Statement was submitted on November 24, 1999, and yet that statement does not mention the agreement. Nor did Titan move to amend its answer or the pre-hearing exchange to reflect this purported agreement. The EPA argues the decision to strike the post-hearing reply exhibits as untimely should be upheld because Titan has not shown good cause for submitting them well after the close of the pre-hearing exchange.

The regulation governing post-hearing admission of evidence is 40 C.F.R. § 22.22, which states in pertinent part:

> If, however, a party fails to provide any document, exhibit, witness name or summary of expected testimony required to be exchanged under § 22.19(a), (e) or (f) to all parties at least 15 days before the hearing date, the Presiding Officer shall not admit the document, exhibit or testimony into evidence, unless the non-exchanging party had good cause for failing to exchange the required information and provided the required information to all other parties as soon as it had control of the information, or had good cause for not doing so.

40 C.F.R. § 22.22(a)(1).

It is undisputed the exhibits were submitted after the close of the pre-hearing exchange. Therefore, Titan had the burden of showing good cause for the delay.

The EAB found that information of the alleged agreement was available to Titan more than a month prior to the completion of the pre-hearing exchange and before the Joint Statement was filed, yet such an arrangement was never mentioned therein. *Id.* at 145. In fact, Titan never attempted to raise the argument regarding the alleged agreement until the close of the *post*-hearing filings on February 12, 2001. *Id.* at 146.

The EAB further reasoned that other modifications were noted in the Amended Complaint but there was no mention of modifications regarding the closure plan requirement. *Id.* Nor did Titan file an amended answer to address the issue. *Id.* For these reasons, the EAB found Titan had not shown "good cause" for not submitting the documents in a timely manner and affirmed the ALJ's ruling.

Titan justifies not mentioning the agreement in the Joint Statement, reasoning it had not yet satisfied its end of the bargain. This justification also fails. First, as the EAB reasoned, the requirement was not new to Titan.

The record before us, however, does not support Titan's positions. That portion of the compliance order requiring Titan to submit a closure plan for the hazardous waste storage areas, and evidence that Titan would establish and maintain financial assurance for closure, was part of the Complaint as originally filed by the Region. Its content was known to Titan prior to the pre-hearing exchange and the filing of the Region's post-hearing brief. Viewed in this light, the requirement of a closure plan was not new to Titan.

---

were irrelevant because they relate to a separate and informal argument addressing a violation the EPA discovered after issuing the CCO. (Complainant's Mot. to Strike) Pl.'s App. at 3.

> Neither document addresses closure of the facility's hazardous waste storage areas as required by the Compliance Order contained in the Complaint. Instead, the docu-

ments address sampling and remediation of petroleum contaminated soil from Respondent's storage of used oil. This issue was not addressed during either inspection that EPA conducted, nor was it referenced by the Compliance Order contained in the Complaint.

*Id.*

*Id.* at 145. Second, in the Joint Statement, the parties listed documents submitted during the pre-hearing exchange which were "authentic and admissible" and not in dispute, such as the CCO, the RCRA Penalty Policy, and Titan's safety manual. (Joint Statement) Pl.'s App. at 27. However, also listed were "authentic" documents submitted by Titan which the EPA disputed, such as the comparative penalty documents. *Id.* at 25–27. Since several disputed documents submitted by Titan were included in the Joint Statement, it was inconsistent for Titan to refrain from submitting documents allegedly supporting an "in lieu of" soil assessment plan simply because Titan had not yet satisfied its end of the bargain.

Titan also argues that the ALJ not only found the exhibits were untimely but also reasoned the exhibits were irrelevant to the determination of Titan's liability. Because liability had been conceded and was not before the ALJ, Titan argues the ALJ's decision was arbitrary and capricious.

This Court is reviewing the final decision of the EAB. Therein, the EAB affirmed the ALJ's decision stating, "we agree with the ALJ *that the exhibits at issue were untimely submitted.*" (EAB's Final Decision) Pl.'s App. at 145 (emphasis added). The EAB reasoned that the record did not support Titan's assertion that good cause existed for failing to submit the exhibits earlier. *Id.* at 145–47. In a footnote, the EAB clearly stated that it did not reach the relevance issue because it found the evidence was properly excluded as untimely. *Id.* at 147. Therefore, the ALJ's decision was affirmed based on the untimeliness of the evidence, and any reference to relevance was harmless error. The EAB correctly affirmed the exclusion of post-hearing exhibits as untimely.

There is substantial evidence in the record to support the EAB's well-reasoned decision affirming the ALJ's order striking the post-hearing exhibits as untimely.

## III. Penalty Assessments

Titan's final challenge is that the penalties assessed were arbitrary, capricious, an abuse of discretion, and not in accordance with the law.

In the amended complaint, the EPA proposed penalties for each of the three counts—Count I—$55,050, Count II—$74,381, and Count III—$20,858—for a total penalty of $150,289. Titan challenges the penalties assessed for each count.

 The scope of review over an agency's penalty assessment is limited. "Congress has entrusted an administrative agency with the responsibility of selecting the means of achieving the statutory policy"; therefore, the reviewing court should not overturn the choice of sanction unless the Court finds it is " 'unwarranted in law or . . . without justification in fact.' " *Butz,* 411 U.S. at 185–86, 93 S.Ct. 1455 (quoting *Am. Power Co. v. SEC,* 329 U.S. 90, 112–13, 67 S.Ct. 133, 91 L.Ed. 103 (1946)). The reviewing court will "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . ." 5 U.S.C § 706.

Titan argues a penalty is unjustifiable in fact if it is inconsistent with penalties imposed by the EPA for comparable violations. Titan further argues the RCRA Penalty Policy mandates uniform application of penalties for like violations. Titan resurrects its argument that penalties which are more severe than those assessed for similar violations mandate reversal. Neither the RCRA Penalty Policy nor case law supports this assertion.

Titan argues *Monieson* demonstrates that a penalty which is too severe should

be reversed upon review. *Monieson,* 996 F.2d at 863. In *Monieson,* the reviewing board modified the sanction imposed by the ALJ reasoning that review of a sanction chosen by an ALJ which falls within the statutory limit is highly deferential, unless the sanction has "no reasonable relation to the practice found to exist." *Id.* In that case, the chosen sanction was a lifetime ban from trading on any contract market; a sanction which the court reasoned was rarely imposed. *Id.*

Titan has not and cannot argue that the civil penalties assessed in the present case are rarely imposed. Furthermore, as previously stated, in *Monieson,* the reviewing board looked at penalties *within its own agency* to determine the sanction was rarely imposed. *Id.* at 862. Here, Titan argues the penalties assessed by Missouri's agency should be considered in determining the severity of penalties assessed by the EPA. Both because *Monieson* arose under a different statutory scheme (SEC) and because comparisons were made within the same agency, *Monieson* is not helpful to Titan.

Titan also cites *Essery,* where the NTSB's recommendation to revoke a commercial pilot's license was reversed. *Essery,* 857 F.2d at 1287. In *Essery,* the ALJ compared the sanction in other cases for the same violation within the same agency and only imposed 120–day suspension. *Id.* at 1291. The NTSB's final decision reinstated the revocation, but the Ninth Circuit reversed upon review. *Id.* The Ninth Circuit found the FAA enforcement manual required "[s]imilar violations under similar circumstances should result in same type of enforcement action and sanction ...." *Id.* In the present case,

however, there is no such mandate. *See supra* Part I.A. Furthermore, the thrust of Titan's argument is not that the EPA is inconsistently enforcing its *own policy,* rather, Titan argues, the EPA's penalties are more severe than those imposed by Missouri's hazardous waste scheme. Because the enforcement policy in *Essery* mandated comparative sanctions within the same agency, it is not helpful to Titan's argument.

Titan also cites *DeLoss v. HUD,* arguing an agency must conform to prior norms and adequately explain its reasons for departure. *DeLoss v. HUD,* 714 F.Supp. 1522, 1534 (S.D.Iowa 1988). In *DeLoss,* the court found the Department of Housing and Human Development ("HUD") violated provisions of its own rules in approving a HUD application. *Id.* In setting aside HUD's decision, the court noted that the errors were the result of a pervasive omission of relevant data, and not merely the "small measure of erroneous data and omission of relevant data [which] probably creeps into most agency decisions in this imperfect world." *Id.* The court found the agency's decision to grant the application was based on inconsistent data and misapplication of HUD's own accepted methodology, and not "on any disagreement with HUD on matters of judgment." *Id.* at 1533.

Titan argues the EPA failed to follow its own policy *mandating* a uniform application of penalties for like violations. However, as previously stated, RCRA's Penalty Policy *does not mandate* a comparison for purposes of imposing sanctions; therefore, unlike HUD in *DeLoss,* here, the EPA has not misapplied its own policy.[16]

---

**16.** In *DeLoss,* the court concluded the agency's decision was arbitrary and capricious, but remarked that it was not disagreeing with HUD on matters of judgment nor intruding upon the "agency's special competence or the

independence of the executive branch." *DeLoss,* 714 F.Supp. at 1533. Rather, the court based its conclusion "entirely upon an application of accepted HUD methodology to accurate an undisputed facts." *Id.*

Titan asserts the ALJ and the EAB made several errors in applying RCRA's policy without an explanation for the deviations. The EPA counters that the EAB's decision should be affirmed because the EAB considered the RCRA factors including the seriousness of the violation, the amount of cooperation and remediation efforts by the Facility, and the size and sophistication of the violator. A review of the EAB's detailed analysis of the penalty calculations reveals that Titan's argument is without merit.

## A. The RCRA Penalty Policy

■ In assessing a proposed civil penalty, the EPA considers three factors set forth in the RCRA Penalty Policy: (1) the gravity-based component; (2) the multiday component; and (3) the economic benefit of noncompliance. (RCRA Penalty Policy) Pl.'s App. at 81. In addition, the "EPA must take into account any good faith efforts to comply with the applicable requirements." *Id.* at 110.

### 1. Gravity-based Component

■ RCRA states that the seriousness of a violation must be taken into account when assessing a penalty. 42 U.S.C. § 6928(a) (2000). "The gravity-based penalty amount should be determined by examining two factors: potential for harm and the extent of deviation from statutory or regulatory requirement." (RCRA Penalty Policy) Pl.'s App. at 82.

#### a. Potential for Harm

■ RCRA was promulgated "to prevent harm to human health and the environment." *Id.* at 93. Therefore, violations of RCRA can result in potential for harm; even violations such as recordkeeping create a risk by "jeopardizing the integrity of the RCRA regulatory program." *Id.* Potential for harm is based on two factors: (1) risk of human or environmental exposure to hazardous waste due to noncompli-

ance; and (2) the adverse effect noncompliance has on the regulatory process. *Id.*

The risk of exposure is determined by evidence of release, mismanagement, and adequacy of provisions for detection and prevention of release. *Id.* at 93–94. Factors used to determine the seriousness of potential contamination are quantity and toxicity of wastes potentially released, probability of environmental transport, and existence, size, and proximity of receptor populations (people and wildlife) and sensitivity of environmental media (surface waters). *Id.* at 94. The emphasis in assessing the potential for harm is placed on the harm posed rather than whether the harm actually occurred. *Id.* Although violation of some RCRA requirements may not give rise to direct or immediate significant risk, violations of such requirements may have serious implications where the violations undermine the regulatory program. *Id.*

The potential for harm is evaluated as minor, moderate or major. *Id.* at 95. An action is a major violation if it (1) poses a substantial risk to humans or other environmental receptors, or (2) has a substantial adverse effect on the regulatory purposes. *Id.* An action is a moderate violation if it (1) poses a significant risk to humans or other environmental receptors, or (2) has a significant adverse effect on the regulatory purposes. *Id.* An action is a minor violation if it (1) poses a relatively low risk of exposure to humans or other environmental receptors, or (2) has a small adverse effect on the regulatory purposes. *Id.* at 96.

#### b. Extent of Deviation

■ "The 'extent of deviation' from RCRA and its regulatory requirements relates to the degree to which the violation renders inoperative the requirement violated." *Id.* at 97. There is a range within

any violation; a violator may be substantially in compliance or totally disregarding the requirement. *Id.* Major deviation is when a violator deviates "to such an extent that most (or important aspects) of the requirements are not met resulting in substantial noncompliance." *Id.* Moderate deviation is when "the violator significantly deviates from the requirements of the regulation or statute but some of the requirements are implemented as intended." *Id.* A minor deviation is when "the violator deviates somewhat from the regulatory or statutory requirements but most (or all important aspects) of the requirements are met." *Id.* Once the category for each element is calculated, the amount of the penalty is determined from the Gravity-based Penalty Matrix.[17] *Id.* at 99. The selection of the amount within the range is left to the discretion of the agency. *Id.*

### 2. Multi-day Component

■ RCRA authorizes the EPA to assess up to $25,000 per day of noncompliance for each violation. *Id.* at 102. Therefore, the EPA is expressly authorized "to consider the duration of each violation as a factor in determining an appropriate total penalty amount." *Id.* Once it is determined a penalty continued for more than one day, it must be determined whether a multi-day penalty is mandatory, presumed, or discretionary. *Id.* A multi-day penalty is appropriate for the number of days for which the violation can be documented or in some cases, where reasonable assumptions as to the duration can be made. *Id.*

Once the duration of the violation has been determined, the agency will determine whether the multi-day penalty is mandatory, presumed, or discretionary. *Id.* at 103. A multi-day penalty is mandatory for days 2—180 of all violations with the following gravity-based designation: major-major, major-moderate, moderate-major. *Id.* A multi-day penalty is presumed for days 2—180 of all violations with the following gravity-based designation: major-minor, moderate-moderate, minor-major. *Id.* Multi-day penalties are discretionary for all days of all violations which are designated: moderate-minor, minor-moderate or minor-minor. *Id.* Next, the agency determines the dollar figure from the corresponding cell in the Multi-day Penalty Matrix.[18] *Id.* at 104.

### 3. Adjustment Factors

■ RCRA states that the agency must take certain factors into account including the violator's good faith efforts to comply. *Id.* at 110. The agency adjusts the sum up or down by considering case-specific circumstances. *Id.* at 81. Other adjustment factors to be considered are the violator's degree of willfulness, history

**17.** RCRA gravity-based penalty matrix before inflation adjustment.

| | | Extent of Deviation from Requirement | | |
|---|---|---|---|---|
| | | Major | Moderate | Minor |
| Potential | Major | $25,000 to 20,000 | $19,999 to 15,000 | $14,999 to 11,000 |
| for | Moderate | $10,999 to 8,000 | $7,999 to 5,000 | $4,999 to 3,000 |
| Harm | Minor | $2,999 to 1,500 | $1,499 to 500 | $499 to 100 |

**18.** RCRA multi-day penalty matrix before inflation adjustment.

| | | Extent of Deviation from Requirement | | |
|---|---|---|---|---|
| | | Major | Moderate | Minor |
| Potential | Major | $5,000 to 1,000 | $4,000 to 750 | $3,000 to 550 |
| for | Moderate | $2,200 to 400 | $1,600 to 250 | $1,000 to 150 |
| Harm | Minor | $600 to 100 | $300 to 100 | $100 |

of noncompliance, ability to pay, and other unique factors. *Id.*

The adjustment factors can increase, decrease, or have no effect on the penalty. *Id.* at 112. The adjustments apply to the sum of the gravity-based and multi-day components. *Id.* With the exception of good faith efforts, the burden of persuasion for downward adjustments is properly on the violator. *Id.* "No downward adjustment should be made if good faith efforts to comply primarily consist of coming into compliance." *Id.* at 113.

### 4. Economic Benefit of Noncompliance

■■■ "The agency civil penalty policy mandates the recapture of any significant economic benefit of noncompliance that accrues to a violator." *Id.* at 105. It is fundamental to the premise of the policy that economic incentives for noncompliance be eliminated. *Id.* The benefit of delayed costs as well as the benefit of avoided costs should be considered. *Id.* at 106. The two types of costs are calculated differently. *Id.* With avoided costs, the benefit equals the costs of complying with the requirement adjusted for anticipated rate of return and income taxes. *Id.* "The economic benefit of delayed costs consists of the amount of interest on the unspent money that reasonably could have been earned by the violator during noncompliance." *Id.*

In the present case, the ALJ reviewed the EPA's calculations, considered the parties' arguments, and found no reason to depart from the EPA's proposed penalties. *See* (ALJ's Initial Decision) Pl.'s App. at 64–75. *See In re Rogers Corp.*, 2000 WL 1770506 (E.P.A. Nov. 28, 2000) ("[A]s we have made clear in many prior decisions, once a presiding officer considers the relevant penalty policy, he or she may adopt the penalty computed in accordance with that policy or deviate therefrom, so long as the penalty assessed reflects the criteria in the applicable statute."). The EAB affirmed the ALJ's decision concluding Titan's arguments had not persuaded the board that the ALJ's determination to uphold the proposed penalties was clear error or an abuse of discretion. (EAB's Final Decision) Pl.'s App. at 157, 166, 172. The EAB iterated its general premise that although it has the discretion to increase or decrease the ALJ's assessed penalty, absent a showing of an abuse of discretion or a clear error, it will not substitute its own judgment for that of the ALJ. *Id.* at 149; *In re Chempace Corp.*, 2000 WL 696821 (EPAEAB May 18, 2000) ("This Board generally will not substitute its judgment for that of a presiding officer when the penalty assessed falls within the range of penalties provided in the penalty guidelines, absent a showing that the presiding officer committed an abuse of discretion or a clear error in assessing the penalty.").

Titan appeals the EAB's decision, arguing it erred in affirming the designations and corresponding penalties for the gravity-based and multi-day components.

### B. Count I

■■■ In Count I of the CCO, the EPA charged Titan with storage of hazardous wastes without a permit on eight different occasions. *See supra* note 4. The EPA found both the potential for harm and the extent of deviation were moderate. Because the gravity-based designation was moderate-moderate, the EPA assessed a multi-day penalty. The EPA also assessed an economic benefit of noncompliance component. The proposed penalty was $55,050: $5,500 gravity-based, $49,225 multi-day, and $325 economic benefit.

Titan argues the penalty for Count I is unlawful because (1) the EPA failed to follow the RCRA Penalty Policy; (2) the decision to impose a multi-day component

was more severe a penalty than appropriate under the law; and (3) the EAB failed to satisfy the statutory requirements of RCRA by refusing to take into account Titan's good faith efforts to comply.

### 1. Gravity-based Penalty

The EPA proposed a moderate-moderate gravity-based designation and proposed a penalty of $5,500, which was at the low end of the moderate-moderate range. *See* Gravity-based Penalty Matrix, *supra* note 17.

#### a. Potential for Harm

In the Initial Decision, the ALJ considered the EPA's proposed moderate potential for harm designation and Titan's argument that the designation should be minor. The EPA reasoned that the potential for harm was moderate because extended storage of hazardous waste increases potential leakage and accidental release of wastes which impact the water supply and disrupt the ecosystem. The EPA further reasoned extended storage of hazardous waste tends to lessen the Facility's waste management accountability, which can result in improper disposal practices and undermine RCRA. The EPA did not propose a minor designation because of the increased risk related to extended storage of hazardous waste, nor did the EPA recommend a major designation because the drums were not damaged, incompatible waste was not stored together, and the majority of the drums were labeled.

Titan argued that the EPA did not consider the facts that (1) drums in both storage areas were not damaged; (2) at the time of inspection, hazardous waste was regularly shipped off-site to a qualified waste disposal company; and (3) incompatible wastes were not stored together. The ALJ disagreed finding the EPA did account for those factors in arriving at a moderate rather than major designation. The fact that Titan shipped the waste off-

site was not persuasive because the removal occurred beyond RCRA's 90–day limit.

The EAB found the record supported the ALJ's conclusion that the risk of exposure to humans and the environment, as well as the adverse effect on the RCRA regulatory program, was significant, and, therefore, a moderate designation for the potential for harm was appropriate. The EAB considered the written testimony of the EPA's compliance officer, Royce Kemp, who stated that the extended storage of the containers was considered in arriving at a moderate rather than a major designation. "[T]he storage of hazardous waste beyond the 90–day regulatory limit significantly increased the potential of leaking containers, accidental releases and exposure at the storage areas, and improper disposal of hazardous waste." (EAB's Final Decision) Pl.'s App. at 159. The EAB also found the agency was correct "that these conditions place facility workers at serious risk when working in the vicinity of, or directly handling leaking hazardous waste containers." *Id.*

On appeal, Titan argues the EAB erred in finding a moderate potential for harm despite the facts that (1) drums in both storage areas were not damaged; (2) at the time of inspection, hazardous waste was regularly shipped off-site to a qualified waste disposal company; and (3) incompatible wastes were not stored together. Titan avers that given the EPA's logic, any violation of the 90–day storage rule will create a moderate potential for harm. Titan concludes, stating based on the factors listed in the RCRA Penalty Policy, the potential for harm was minor and therefore the EAB failed to follow EPA's own policy.

The EAB thoroughly outlined several factors which demonstrate why a moderate designation was merited and correctly determined the moderate designation was

warranted because the extended storage periods of hazardous waste significantly increased the potential for leakage caused by rusting. Furthermore, Titan concedes it stored hazardous waste in excess of 90 days on the listed occasions.

The EAB found the record supported the ALJ's moderate potential for harm designation because storage of the containers beyond the 90 days placed the workers at serious risk of harm. The EAB made a well-reasoned affirmance of the ALJ's decision, and therefore the moderate potential for harm designation on Count I was not arbitrary or capricious.

b. Extent of Deviation

The ALJ recited and adopted the EPA's determination that the extent of deviation was moderate. In arriving at that designation, the EPA reasoned that during the relevant four-year period, Titan was never in compliance with RCRA's storage of hazardous waste regulation 40 C.F.R. § 265.16. The ALJ agreed and further reasoned that from May 1994 through April 1998, Titan had eight separate violations, and in each instance the containers were stored outside in excess of 100 days. The longest violation period was 264 days, and least was 111 days. The violations were not disclosed nor was remedial action taken until two months after the February 1998 inspection.

The EAB reasoned that the record supported the ALJ's findings. In addition, the EAB reasoned a moderate designation was appropriate because Titan was in violation of at least four other regulations for which it was not charged.[19]

On appeal, Titan argues the moderate extent of deviation designation was exaggerated because it was based on the irrelevant fact that outside storage in excess of 90 days increased the risk of leakage from rusting. Titan argues this factor should be used only in determining the potential for harm not the extent of deviation. Titan further argues it was charged with a violations of *40 C.F.R. § 262.34(b),* and therefore the extent of deviation should be based *exclusively* on the number of days that hazardous waste was stored beyond the 90–day limit.

Titan's arguments fail for several reasons. First, Count I of the CCO does not charge Titan with a violation of 40 C.F.R. § 262.34(b); rather, Count I charges Titan with violation of 42 U.S.C. § 6925(a) for storage of hazardous waste without a permit or interim status. Second, upon considering the *degree* to which the violation rendered the requirement inoperative, the EAB found the fact that Titan stored spent solvents over 90 days on at least eight different occasions warranted a moderate extent of deviation designation. The EAB reasoned that a minor characterization was rejected because during each of the violation periods, Titan was also in violation of other RCRA regulations.

Third, RCRA's Penalty Policy states "[t]he 'extent of deviation' from RCRA and its regulatory requirements relates to the degree to which the violation renders inoperative the requirement violated." (RCRA Penalty Policy) Pl.'s App. at 97. As an example, the Penalty Policy suggests the extent of deviation is moderate if "the violator significantly deviates from the requirements of the regulation or statute but some of the requirements are implemented as intended." *Id.* The EPA's reasoning was based on the degree of noncompliance, that is, Titan had eight different violations. Although Titan argues the extent of the

---

19. The additional violations were failure to date and mark containers, lack of access to communications or alarm system at storage area, inadequate aisle space, and failure to make hazardous waste determinations.

violation should be based *exclusively* on the number of days beyond the 90–day limit, there is nothing in the RCRA Penalty Policy which supports this supposition. The policy equates a major violation with *substantial* noncompliance, a moderate violation with *significant* noncompliance, and a minor violation with a violator who deviates *somewhat* from the regulations. Titan was clearly more than *somewhat* in violation.

The EAB's affirmance of a moderate extent of deviation was not arbitrary or capricious.

### 2. Multi-day Component

Based on the moderate-moderate gravity-based component, the EPA proposed a multi-day penalty of $275 per day, which was at the low end of the range. This amount was multiplied by 179, the maximum number of days presumed appropriate. *Id.* at 103. The EPA explained that the full 179 days was used because the total number of days of violation exceeded 500. The ALJ adopted the proposed penalty, and the EAB affirmed.

Titan argues that since the severity of the violation was overstated, imposition of a multi-day component was incorrect. Titan also asserts a multi-day penalty is superfluous when the number of days be-

yond 90 is already considered in determining the extent of deviation.[20]

The EPA refutes this argument, stating the multi-day component was presumed unless Titan came forward with case-specific facts to overcome this presumption. The EPA merely buttressed the presumption by pointing out there were at least 500 days of violations.

The moderate-moderate gravity-based component was appropriate. Therefore, a multi-day component is presumed. The EPA assessed the penalty at the low end of the range for a moderate-moderate gravity-based penalty and applied the maximum 179 days. The decision was well-reasoned and supported by the record. The EAB's affirmance of the multi-day component was not arbitrary or capricious.[21]

### 3. Good Faith Efforts

Titan's final argument is that the EAB did not consider Titan's good faith efforts in assessing the penalty. Titan argues it demonstrated good faith by removing all drums once the violations were brought to its attention. Titan further argues the EPA did not consider that the drums were undamaged, they were regularly shipped off-site to a qualified waste facility, and incompatible wastes were not stored to-

---

**20.** Titan cites *Steeltech, Ltd. v. United States Environmental Protection Agency*, 105 F.Supp.2d 760, 768 (W.D.Mich.2000), stating the court cannot twice credit a plaintiff for substantially identical factors, likewise, the EPA should not be allowed to *add* a multi-day penalty using the same factors used to classify the gravity component. However, Titan misapplies the premise set forth in *Steeltech*. There, the adjustment factors, not the factual considerations, were mutually exclusive. *Id.* ("Appellant's request for an application of both attitude and voluntary disclosure reductions to the various counts is contrary to the EPA's policy of treating these reductions as 'mutually exclusive.'"). In *Steeltech*, the court reasoned that under Emergency Plan-

ning and Community Right–to–Know Act ("EPCRA"), the court considered one or the other, not both. *Id.* However, in the present case, the separate components are not mutually exclusive; Titan offers no support for a contrary conclusion.

**21.** Titan asks the Court to reassess the extent of deviation and/or potential for harm as minor. Titan reasons that the multi-day component would then be discretionary and the Court could eliminate it. This remedy is not available as the Court would be required to remand the case for the EPA to determine whether to a assess a discretionary multi-day component.

gether. Titan reasons that the failure to consider these good faith efforts makes the EAB's decision arbitrary and capricious.

The EPA argues that compliance after the CCO was issued does not constitute a good faith effort. Furthermore, the EPA *did* consider the facts that the drums were not damaged, incompatible wastes were not stored together, and hazardous waste was regularly shipped off-site. As stated above, Kemp specifically pointed out that a *major* designation was not warranted because of those factors. (Kemp Test.) Pl.'s App. at 213. Kemp also reasoned that the extended periods of hazardous waste storage precluded a minor designation. *Id.*

The RCRA Penalty Policy requires the EPA to consider a violator's good faith efforts to comply. However, the policy makes clear that a good faith effort is demonstrated by the prompt identification and remediation of violations *before* they are detected by the EPA. (RCRA Penalty Policy) Pl.'s App. at 113. The policy further states "[n]o downward adjustment should be made if the good faith efforts to comply primarily consist of coming into compliance." *Id.* Contrary to Titan's assertions, its good faith efforts to comply were considered but the EPA found a good faith downward adjustment was not appropriate.

## C. Count II

■ In Count II of the CCO, the EPA cited Titan for failure to develop or implement a personnel training program. The EPA assessed a moderate-moderate gravity-based component, a multi-day component and an economic benefit of noncompliance component. The proposed penalty was $74,381: $5,500 gravity-based, $49,225 multi-day, and $19,656 economic benefit.

Titan argues the penalty for Count II is unlawful because (1) the EPA failed to follow the RCRA Penalty Policy; (2) the decision to impose a multi-day component

was more severe a penalty than appropriate under the law; and (3) the EAB failed to satisfy the statutory requirements of RCRA by refusing to take into account Titan's good faith efforts to comply.

### 1. Gravity-based Penalty

The EPA proposed a moderate-moderate gravity-based designation and proposed a penalty of $5,500 which was at the low end of the moderate-moderate range. *See* Gravity-based Penalty Matrix, *supra* note 17.

#### a. Potential for Harm

The EPA found the potential for harm was moderate because:

> (1) the risk that untrained workers pose to themselves and the environment; (2) the fact that some of the violations discovered during the inspection might have been avoided had Titan provided appropriate training to its employees; and (3) harm caused to the RCRA program by Titan's failure to develop and implement a hazardous waste management training program.

(EAB's Final Decision) Pl.'s App. at 163. The EPA reasoned a minor designation was not appropriate because of the risk posed by untrained personnel. The EPA similarly reasoned a major designation was not appropriate because Titan had provided Occupational Safety and Health Act ("OSHA") training.

The EAB affirmed that Titan's failure to train personnel created a moderate potential for harm. The EAB reasoned that had personnel been properly trained, the inspection may not have resulted in so many violations.

Titan argues the EPA violated its own policy by not considering other penalty assessments when it determined that lack of personnel training created a moderate potential for harm. Titan cites two cases

in which the EPA assessed a lower penalty for failure to train personnel.[22]

As previously discussed, comparisons to other cases are not required by the RCRA Penalty Policy. A minor potential for harm was not appropriate because the failure to train personnel put personnel and others at risk of exposure due to improper handling and storage of hazardous wastes. (Kemp Test.) Pl.'s App. at 216–17. Had the personnel been properly trained, some of the violations may not have occurred. Furthermore, failure to implement the regulations creates a potential for harm to the integrity of the RCRA program.

The EAB gave a reasoned explanation for affirming the ALJ's decision which is supported by the record. The EAB's decision was not arbitrary or capricious.

b. Extent of Deviation

The EPA also found a moderate extent of deviation designation was appropriate because Titan "largely" did not comply with the personnel training requirements of 40 C.F.R. § 265.16, the Facility personnel had not completed the necessary hazardous waste training, and Titan did not have written job descriptions or documentation of completed training. The EPA

did not select a minor deviation because Titan's failure to conduct any reviews of the hazardous waste management procedures contributed to the Facility's noncompliance with other regulations. The ALJ found this assessment appropriate and adopted it.

The EAB affirmed, reasoning a minor extent of deviation is only appropriate when most or all important aspects have been met. As such, Titan did not meet that standard. The OSHA training did not include all or most elements of 40 C.F.R. § 265.16, such as hazardous waste management procedures, emergency procedures, or annual reviews, nor did Titan have records documenting the training of Facility personnel or written job descriptions as required. Therefore, the EAB found no error in the moderate extent of deviation designation.

Titan argues the EAB should not have affirmed the moderate extent of deviation designation for Count II because the *important* aspects of the training regulations were met through compliance with OSHA regulations. Titan further argues only the violations for which it was cited should be considered in determining the extent of deviation.

---

**22.** Titan cites *In re Cirtek Maryland, Inc.,* 1992 WL 90323 (E.P.A Mar. 30, 1992), where the ALJ without discussion reasoned the potential for harm was minor. In the present case, the EAB concluded that "failure to provide specific hazardous waste training and annual updates to its employees pose a significant risk to untrained employees and the environment, and that some of the violations discovered during the inspection might have been avoided had Titan provided appropriate training to its employees, we affirm the ALJ's determination." (EAB's Final Decision) Pl.'s App. at 167. Unlike *Cirtek*, in the present case, the EAB gave a reasoned decision in arriving at a moderate potential for harm designation for Count II.

Titan also cites *In re Redfield Co.,* 1983 WL 31574 (E.P.A Dec. 12, 1983), where the ALJ

determined the failure to implement a training program constituted a minor violation. However, in *Redfield,* unlike here, the company had complied with all but record keeping requirements of 40 C.F.R. 265.16. *Id.* at *8, 1983 WL 31574 ("The inspection also disclosed that although Redfield had administered safety training to its employees, it had failed to document the incidence of individual training and had otherwise failed to satisfy the RCRA personnel training record keeping requirements set forth in 40 CFR § 265.16."). In the present case, Titan did not implemented a personnel training until August 4, 1998, six months after the EPA inspection. (Joint Statement) Pl.'s App. at 24. Therefore, the violation at issue in *Redfield* was dissimilar to the violation in the present case.

As discussed with regard to Count I, RCRA's Penalty Policy clearly states that a minor extent of deviation is appropriate when "the violator deviates somewhat from the regulatory or statutory requirements but most (or all important aspects) of the requirements are met." (RCRA Civil Penalty Policy) Pl.'s App. at 97. Titan admits it was not in compliance with RCRA personnel training program. (Joint Statement) Pl.'s App. at 24. Titan's noncompliance with other RCRA requirements was properly considered under the extent of deviation because those violations could have been avoided if Titan had properly trained its personnel. The fact that it was in compliance with other training programs (OSHA) does not satisfy RCRA's requirements, nor does it demonstrate that most or all important aspects of the RCRA training requirement were met. The EAB's decision to affirm the ALJ's moderate extent of deviation designation was not arbitrary or capricious.

### 2. Multi-day Component

As with Count I, a multi-day component was presumed because a moderate-moderate gravity-based penalty was assessed. The EPA proposed a multi-day penalty of $275 per day, which was at the low end of the range. This amount was multiplied by 179, the maximum number of days presumed appropriate. The EPA reasoned this was an appropriate penalty to serve as a deterrent. The ALJ adopted the proposed penalty, and the EAB affirmed.

The moderate-moderate gravity-based designation was appropriate, and therefore the multi-day component is presumed. The EAB's affirmance of this decision was not arbitrary or capricious.

### 3. Good Faith Efforts

Titan argues the EAB did not consider its good faith efforts to comply when calculating the extent of deviation on Count II. Titan states it had employee training in place prior to the inspection. Following the inspection, Titan instituted a new hazardous waste management program, and two employees had taken a hazardous waste operations training course by March 31, 1998.

Titan's good faith efforts were considered, but the EPA found a downward adjustment was not merited. The aforementioned "efforts" Titan offers do not constitute a good faith effort to comply. First, the training Titan alleges it had in place prior to the inspection was designed to satisfy OSHA requirements and did not satisfy RCRA requirements. (ALJ's decision) Pl.'s App. at 63 ("While Respondent did provide its employees with OSHA hazardous communication training and had a pamphlet at the facility describing proper hazardous waste management, Respondent failed to have a written description of the personnel training program or records documenting that persons working at the facility received and completed such training.").

Second, it was after the violations were discovered by the EPA that Titan implemented a training program. Furthermore, the program was not in effect until six months after the violations were discovered. (Joint Statement) Pl.'s App. at 24 ("Respondent [Titan] did not develop or implement a personnel training program covering the requirements of 40 C.F.R. § 265 as required by 40 C.F.R. § 265.16 at any time prior to August 4, 1998.").

The ALJ considered and did not find Titan made any good faith efforts to comply; therefore, the EAB correctly affirmed the moderate-moderate gravity-based designation.

### D. Count III

In Count III of the CCO, the EPA cited Titan for failure to have and update an adequate contingency plan for the Fa-

cility. The EPA assessed a minor-moderate gravity-based component, a multi-day component, and an economic benefit of noncompliance component. The proposed penalty was $20,858: $550 gravity-based, $19,690 multi-day, and $618 economic benefit.

### 1. Gravity-based Component

The EPA proposed a minor-moderate gravity-based designation and proposed a $550 penalty, which was at the low end of the range.

#### a. Potential for Harm

The EPA assessed the potential for harm for Count III as minor. Titan does not appeal this determination.

#### b. Extent of Deviation

The EPA proposed a moderate extent of deviation designation because Titan's contingency plan lacked several required items. A major designation was not proposed because Titan had an OSHA Emergency Action Plan. The ALJ adopted the EPA's proposed designation, reasoning Titan was lax in complying with the CCO since it did not update its contingency plan until six months after receiving the violation.

The EAB found the ALJ did not err in adopting the moderate extent of deviation designation. Specifically, the EAB found a minor designation was not appropriate because Titan had not met most or all important aspects of requirements. The EAB found the parties stipulated to the deficiencies in the Joint Statement. Furthermore, although Titan's OSHA plan covered some of the RCRA contingency plan requirements, several were missing. Specifically, Titan failed to (1) arrange to coordinate emergency services; (2) list names, addresses, and phone numbers of qualified emergency coordinators; (3) list all emergency equipment; (4) specify actions to be taken in the event of fire, explosion, or other unplanned event; and (5) prepare an evacuation plan. For those reasons, the EAB affirmed the ALJ's decision.

Although the OSHA plan overlapped in some ways with RCRA's contingency plan requirements, it did not bring Titan in compliance with "most or all important aspects" of RCRA. Therefore, Titan was not entitled to a minor extent of deviation classification. The EAB correctly affirmed the moderate extent of deviation classification on Count III.

### 2. Multi-day Penalty

The EPA added a discretionary multi-day component which the ALJ adopted. The EPA reasoned Titan's failure to remedy the violation expeditiously created additional risks. The EPA proposed a multi-day penalty of $110 per day, which was at the low end of the minor-moderate range. The EPA used 179 days because Titan's violation was for well over that number. The ALJ adopted the EPA proposed penalty, and the EAB affirmed.

The RCRA Penalty Policy allows the agency to assess a discretionary multi-day penalty if the bases for the decision are documented in the case file. (RCRA Penalty Policy) Pl.'s App. at 103. The EPA detailed its reasons for imposing the discretionary component and therefore fulfilled the requirement. The EAB's affirmance of the ALJ's decision was not arbitrary or capricious.

### 3. Good Faith Efforts

Titan argues the extent of deviation determination was unlawful because the EPA failed to follow the RCRA Penalty Policy and failed to consider Titan's good faith efforts to comply. Specifically, Titan asserts the EPA did not consider the overall extent to which Titan complied with the

contingency plan requirements by having the OSHA Emergency Action Plan in place. Titan argues the OSHA plan satisfied several of the RCRA contingency plan requirements and therefore the extent of deviation should have been classified as minor. Titan argues the plan was only deficient in a few ways and it established a policy to update the contingency plan following the issuance of the violations. Titan asserts it had made emergency service arrangements with local authorities as noted in the Joint Statement.

Titan did not meet the standard for a minor extent of deviation classification because the OSHA plan failed to satisfy several RCRA requirements. The OSHA plan only partially satisfied two of the RCRA requirements and did not (1) arrange for coordination of emergency services; (2) provide names, addresses, and phone numbers of all persons qualified to act as emergency coordinators; or (3) list the Facility's emergency equipment. Contrary to Titan's assertion, it admitted it *had not* made arrangements with local authorities in the Joint Statement. (Joint Statement) Pl.'s App. at 24 ("Prior to August 4, 1998, Respondent's Contingency Plan ... did not describe arrangements agreed to by local police departments, fire departments, hospitals, contractors, and State and local emergency response teams to coordinate emergency services ....").

Furthermore, Titan's good faith efforts were considered, but Titan did not meet the criteria. First, as stated above, the OSHA plan did not satisfy most or all of the RCRA requirements. Second, there is no evidence Titan implemented the OSHA plan as an effort to comply with RCRA criteria, rather, any compliance was incidental. Third, changes made after the violations were discovered by the EPA did not constitute a good faith effort to comply. In addition, the efforts Titan did

make were not implemented until six months after the inspection.

There is adequate evidence in the record to support the ALJ's decision; the EAB affirmance was not arbitrary or capricious.

**E. Calculation of the Economic Benefit of Noncompliance Component**

In calculating the proposed penalty for each of the three counts, the EPA assessed an economic benefit of noncompliance component. The economic benefit of noncompliance for each Count in the CCO was $325, $19,656, and $618, respectively, making the total amount Titan was assessed for the economic benefit of noncompliance $20,599. Titan challenges the EPA's authority to assess an economic benefit of noncompliance penalty. In the alternative, Titan argues the method used by the EPA in determining these amounts is flawed and has been frequently criticized.

The EPA disputes both of these arguments. First, the EPA argues Titan is raising the issue of the EPA's authority to add an economic benefit component for the first time on appeal to this Court, and therefore the argument should not be considered. Second, the EPA argues the selected calculation method was supported by the testimony of the EPA's expert. The EPA further asserts Titan did not present expert testimony regarding the preferability of an alternate calculation method or to refute the EPA's expert.

**1. EPA's Authority to Assess an Economic Benefit Penalty**

Titan concedes it did not fully brief the issue of the EPA's authority to impose an economic benefit of noncompliance penalty in the proceedings below but argues it did enough to preserve the issue on appeal by arguing the calculation of the economic benefit was arbitrary and illegal.

The EPA counters that referring to the *calculation* as arbitrary and illegal is not a challenge to the EPA's authority to impose the penalty and therefore represents a new issue presented for the first time to this Court.

On review, this Court is limited to those issues presented during the administrative proceeding. *Cent. South Dakota Co-op. Grazing Dist. v. Sec'y of the United States Dep't of Agric.*, 266 F.3d 889, 901 (8th Cir.2001) ("We need not consider arguments a party failed to raise before the agency.") (citing *Downer v. United States*, 97 F.3d 999, 1005 (8th Cir.1996) ("[P]laintiff failed to present the point before the agency. We need not consider arguments the parties failed to raise before the agency.")). At the administrative level, Titan only challenged the *calculation method* used to determine the economic benefit of noncompliance, which was not a challenge to the EPA's authority to impose the penalty. Therefore, this Court need not consider the issue on appeal. *Id.*

Titan argues this case represents the rare exception in which the Court has the discretion, under the waiver rule, to consider an issue for the first time on appeal. *New Jersey Dept. of Educ. v. Hufstedler*, 724 F.2d 34, 36 n. 1 (3d Cir.1983), *rev'd on other grounds by Bell v. New Jersey*, 461 U.S. 773, 103 S.Ct. 2187, 76 L.Ed.2d 312 (1983) ("[O]ur practice has been to hear issues not raised in earlier proceedings when special circumstances warrant an exception to the general rule."). However, the Court finds this case does not present a "rare" issue of national importance to merit an exception to the general rule. *See id.* (reasoning the retroactivity of a federal statute was an issue of national importance and squarely within the competence of an appellate court).

## 2. The Method Used to Calculate the Economic Benefit of Noncompliance

■ During the pre-hearing exchange, the EPA offered the report of Jonathan S. Shefftz ("Shefftz") detailing Titan's economic benefit of noncompliance. (Expert Report of Jonathan Shefftz) Pl.'s App. at 225–228. "The economic benefit calculation is based on the concept of the 'time value of money.'" *Id.* at 227. This involves the calculation and comparison of on-time and delayed compliance, adjusted for inflation and tax deductions. *Id.* at 227–28.

Shefftz explained the chosen method.[23]

A company must on average earn a rate of return necessary to repay its debt capital holders (e.g., banks, bondholders) and satisfy its equity capital owners (e.g., partners, stock holders). While companies often earn rates in excess of their cost of capital, companies that do not on average earn at least their cost of capital will not survive . . . . The cost of capital therefore represents the minimum expected return a company can earn on average on monies not invested in pollution control, or, viewed alternatively, represents the avoided costs of financing pollution control investments. Thus, a company should make its business decisions by adjusting cash flows to present values at its cost of capital, and my economic benefit approach follows the internal analysis a company will normally perform.

*Id.* After applying the method and making the calculations, Shefftz concluded that Titan "reaped an economic benefit of $20,599 from delayed compliance with RCRA requirements at its Walcott facility." *Id.* at 228. Titan did not offer opinion evidence on the issue.

---

**23.** The EAB's Final Decision details Shefftz' report and calculations. (EAB's Final Decision) Pl.'s App. at 177–180.

Titan argues the weighted average cost of capital ("WACC") method used to calculate the economic benefit was arbitrary and illegal. Titan reasons that had the EPA used the more appropriate "risk-free rate" method, the penalty would have been significantly lower.[24]

To support its position, Titan cites *United States v. WCI Steel, Inc.,* and argues the court rejected the WACC method and preferred the risk-free rate method. *United States v. WCI Steel, Inc.,* 72 F.Supp.2d 810, 830–31 (N.D.Ohio 1999). As the EAB determined, *WCI Steel* does not support Titan's assertion.

In *WCI Steel,* both the EPA and the violator presented expert testimony regarding the calculation of the economic benefit of noncompliance. *Id.* at 831. The court made a credibility determination and found WCI's expert to be more credible. *Id.* Contrary to Titan's interpretation, the court did not reason WACC is always inappropriate; rather, the court found, in that case, the argument for the risk-free rate method was more credible. *Id.* at 830.[25]

After considering Titan's challenge to the application of the WACC method and examining the cases cited by Titan, the EAB found the challenge was without merit. The EAB opined that "Titan forfeited its opportunity to cross-examine the Region's expert on its WACC-related concerns and further failed to proffer any evidence before the ALJ that use of the WACC [sic] method was erroneous." *Id.* at 184. The EAB reasoned, "[w]here, as here, the Region seeks to recover a violator's economic benefit of noncompliance, and the calculation of that benefit utilizes a discount rate, the record in any given matter must contain a reasoned explanation and supportable rationale for the selection and use of the discount rate." (EAB's Final Decision) Pl.'s App. at 81 (citing *In re New Waterbury, Ltd.,* 5 E.A.D. 171, 227 (EAB 1997)). The EAB found the EPA met that burden. "In particular, the expert witness indicated that his economic approach follows the internal analysis a company will normally perform." *Id.* at 182.

The EAB examined the EPA's chosen method and found the expert's analysis

**24.** The risk-free rate method would have produced a penalty of $17,205, whereas, the WACC method resulted in a penalty of $20,599, a difference of $3,394.

**25.** In addition to *WCI Steel,* Titan cites several other cases to support its argument that the WACC method is flawed and the risk-free method is preferred. In its final decision, the EAB examined and distinguished each case. *See* (EAB Decision) Pl.'s App. at 183 n. 59. The Court has also considered these cases and similarly found they do not support Titan's argument. *See Atl. States Legal Foundation, Inc. v. Universal Tool & Stamping Co.,* 786 F.Supp. 743, 751 (N.D.Ind.1992) (making no reference to WACC method in discussing the chosen economic benefit calculation); *United States v. Roller Coater, Inc.,* 1991 U.S. Dist. LEXIS *12–15 (S.D.Ind. May 22, 1991) (comparing the economic benefit calculations of "dueling experts" using the avoided and delayed cost analysis and found the factors con-

sidered by the defendant's expert were more pertinent than those considered by the plaintiff's expert, but never criticized the method used); *Student Pub. Interest Research Group of New Jersey, Inc. v. Hercules, Inc.,* 19 E.L.R. 20903, 20905 (D.N.J.1989) (rejecting the complex BEN model calculation and adopting the plaintiff's modified alternative method because those calculations appeared "to reflect a reasonable approach to determining the economic benefits derived by Hercules from avoiding costs associated with the operation of wastewater treatment"). In *Proffitt v. Lower Bucks County Joint Municipal Auth.,* 1988 WL 48552 at *6 (E.D.Pa. May 12, 1988), the EPA's expert used the BEN method to calculate the economic benefit of noncompliance. Defendant's expert criticized assumptions used in that calculation and presented his own calculations. *Id.* The court reasoned that the defendant's expert was more credible. *Id.* The WACC method was never discussed. *Id.*

and calculations to be appropriate. The EAB considered and rejected Titan's argument that the WACC calculation was flawed. This is not a record in which the ALJ or the EAB failed to consider expert testimony regarding a preferred alternative method of calculating the economic benefit of noncompliance. Absent such a showing, the Court must give deference to the EPA's chosen methodology. *EPA v. Nat'l Crushed Stone Ass'n*, 449 U.S. 64, 83–84, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980).

## IV. EPA's Counterclaim and Motion for Summary Judgment

The EPA counterclaims and moves for summary judgment requesting enforcement of the penalty, plus accrued interest pursuant to 31 U.S.C. § 3717 and 40 C.F.R. § 13.11. The EPA also requests the Court award the costs of this action.

In response to the EPA's counterclaim, Titan argues it is not liable for the penalty because it is arbitrary, capricious, and an abuse of discretion. Titan further claims the affirmative defense that the claim for interest is time-barred under 28 U.S.C. § 2462 and by the doctrines of waiver, laches, unclean hands, and estoppel. Titan further argues the EPA is not entitled to interest because the EPA's failure to waive collection of interest was arbitrary, capricious, and an abuse of discretion under 40 C.F.R. § 13.11.

Title 31 U.S.C. § 3717 states in pertinent part, "[t]he head of an executive, judicial, or legislative agency shall charge a minimum annual rate of interest on an outstanding debt on a United States Government claim owed by a person ...." 31 U.S.C. § 3717(a) (2000). Interest accrues from the date the notice was mailed. *Id.* § 3717(b). "The rate of interest charged under subsection (a) of this section is the rate in effect on the date from which interest begins to accrue; and remains fixed at

that rate for the duration of the indebtedness." *Id.* § 3717(c). The statute further allows that the agency may assess "a charge to cover the cost of processing and handling a delinquent claim." *Id.*

Chapter 40 C.F.R. § 13.11 demands "EPA *will* assess interest on all delinquent debts unless prohibited by statute, regulation or contract." 40 C.F.R. § 13.11 (emphasis added). "Interest begins to accrue on all debts from the date of the initial notice to the debtor.... The rate of interest, as initially assessed, remains fixed for the duration of the indebtedness." *Id.*

■ Titan asserts several affirmative defenses. First, Titan asserts the EPA's claim is timed barred by 28 U.S.C. § 2462 which states that "an action, suit or proceeding for the enforcement of any civil ... penalty ... shall not be entertained unless commenced within five years from the date when the claim first accrued ...." 28 U.S.C. § 2462 (2000). The EAB's Final Decision was rendered on June 6, 2002, wherein Titan was ordered to pay the penalty within thirty days. The EPA asserts it mailed Titan the notice on June 7, 2002; therefore, interest began accruing on that date. As such, the counter-claim for payment of interest was brought within five years of the date of accrual.

Second, Titan asserts an action for interest is arbitrary, capricious, and an abuse of discretion because the agency failed to waive collection of interest under 40 C.F.R. § 13.11. The waiver provision states:

(e) Waiver.

(1) The Administrator may (without regard to the amount of the debt) waive collection of all or part of accrued interest, penalty or administrative costs, where he determines that—

(i) Waiver is justified under the criteria of § 13.25;

(ii) The debt or the charges resulted from the Agency's error, action or inaction, and without fault by the debtor; or

(iii) Collection of these charges would be against equity and good conscience or not in the best interest of the United States.

(2) A decision to waive interest, penalty charges or administrative costs may be made at any time prior to payment of a debt. However, where these charges have been collected prior to the waiver decision, they will not be refunded. The Administrator's decision to waive or not waive collection of these charges is a final agency action.

40 C.F.R. § 13.11(e).

 Titan suggests since the EPA has the authority to waive interest, not doing so is an abuse of discretion. The plain language of the provision does not support Titan's assertion. The collection provision of § 13.11 uses mandatory language, "EPA *will* assess interest on all delinquent debts ....", *id.* § 13.11(a) (emphasis added), whereas, the waiver provision uses permissive language, "[t]he Administrator *may* ... waive collection of all or part of accrued interest ....", *id.* § 13.11(e) (emphasis added).

Titan has not presented a valid argument to contravene the statutory support for the EPA's demand.

### CONCLUSION

The EAB's decision was not arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law; therefore, the Court **affirms** that decision. Plaintiff's Motion for Summary Judgment is **denied**.

---

26. The interest rate will be the United States Treasury Tax and loan rate on June 7, 2002;

The EPA's motion for summary judgment on its counterclaim is **granted in part**. The Court orders Titan to pay the penalty of $150,289, plus interest on that amount from June 7, 2002.[26] The Court reserves judgment on the issue of costs and directs the EPA to submit documentation and an affidavit in support thereof within thirty days of the date of this order.

**IT IS SO ORDERED.**

said rate will remain fixed for the duration of the indebtedness. 40 C.F.R. § 13.11(a).